IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| MYMAIL, LTD., | |
| Plaintiff, | |
| v. | C.A. No. 17-1219-MN |
| NETGEAR, INC., | |
| Defendant. | |

## JOINT CLAIM CONSTRUCTION BRIEF

TABLE OF CONTENTS

Table of Contents ................................................................................................................. ii
Table of Authorities............................................................................................................. iii
    Cases ............................................................................................................................. iii
    Other Authorities ........................................................................................................... v
I.      Introduction ............................................................................................................... 1
        A.      MyMail's Opening Introduction.................................................................... 1
                1.      The '318 patent-in-suit ...................................................................... 1
                2.      The related '290 patent ..................................................................... 2
                3.      Prior district court claim construction proceedings involving the related
                        '290 patent. ....................................................................................... 3
                4.      Prior district court summary judgment proceedings involving the related
                        '290 patent. ....................................................................................... 3
                5.      Prior appellate proceedings involving the related '290 patent. ............ 4
                6.      Prosecution history of the '318 patent. ............................................... 5
        B.      NETGEAR's Response Introduction .............................................................. 9
                1.      Background of the '318 and '290 Patents ......................................... 11
                2.      Asserted Claim 5 of the '318 Patent ................................................ 13
                3.      The Parent '290 Patent .................................................................... 14
        C.      MyMail's Reply Introduction...................................................................... 16
                1.      Patented Technology....................................................................... 16
                2.      Issue Preclusion.............................................................................. 16
                3.      Relevant Intrinsic Evidence ............................................................ 22
        D.      NETGEAR'S Sur-Reply Introduction.......................................................... 22
                1.      MyMail Mischaracterizes an Evidence Issue as an Estoppel Issue.... 23
II.     LEGAL PRINCIPLES................................................................................................ 24
        A.      MyMail's Legal Principles ......................................................................... 24
III.    DISPUTED CLAIM TERMS.................................................................................... 27
        A.      Term - "network service provider" or "NSP"; and "access provider" ............ 27
                1.      MyMail's Opening Position ............................................................ 27
                2.      NETGEAR's Answering Position ..................................................... 34
                3.      MyMail's Reply Position ................................................................ 42
                4.      NETGEAR's Sur-Reply Position ..................................................... 45
        B.      Term – "network access information" and "set of network access
        information".................................................................................................. 51
                1.      MyMail's Opening Position ............................................................ 51
                2.      NETGEAR's Answering Position ..................................................... 52
                3.      MyMail's Reply Position ................................................................ 53
                4.      NETGEAR's Sur-Reply Position ..................................................... 54
        C.      Term – "network"...................................................................................... 54
                1.      MyMail's Opening Position ............................................................ 55
                2.      NETGEAR's Answering Position ..................................................... 56
                3.      MyMail's Reply Position ................................................................ 59
                4.      NETGEAR's Sur-Reply Position ..................................................... 60
        D.      Term – "re-accessing"................................................................................ 60
                1.      MyMail's Opening Position ............................................................ 60

2.      NETGEAR's Answering Position ..................................................61
3.      MyMail's Reply Position ...............................................................63
4.      NETGEAR's Sur-Reply Position ..................................................64
IV.     CONCLUSION...................................................................................................64
A.      MyMail's Conclusion..................................................................................64
B.      NETGEAR's Conclusion ............................................................................65

TABLE OF AUTHORITIES

**Page(s)**

*Cases*

*A.B. Dick Co. v. Burroughs Corp.*,
713 F.2d 700 (Fed. Cir. 1983) ........................................................................... 17, 26

*AbTox, Inc. v. Exitron Corp.*,
131 F.3d 1009 (Fed. Cir. 1997) ................................................................................ 42

*ACTV, Inc. v. Walt Disney Co.*,
346 F.3d 1082 (Fed. Cir. 2003) ............................................................................... 58

*Adams Respiratory Therapeutics v. Perrigo*,
616 F.3d 1283 (Fed. Cir. 2010) ............................................................................... 43

*Apple v. Motorola*,
757 F.3d 1286 (Fed. Cir. 2014) ............................................................................... 25

*Bayer AG v. Biovail Corp.*,
279 F.3d 1340 (Fed. Cir. 2002) ............................................................................... 26

*Becton, Dickinson v. Tyco Healthcare Group*,
616 F.3d 1249 (Fed. Cir. 2010) ............................................................................... 25

*Blonder-Tongue Laboratories, Inc. v. University of Illinois Foundation*,
402 U.S. 313, 91 S. Ct. 1434, 28 L.Ed. 2d 788 (1971) ............................................. 30

*Burlington N. R.R. v. Hyundai Merch. Marine Co.*,
63 F.3d 1227 (3d Cir. 1995) ............................................................................... 26, 41

*CIAS, Inc. v. Alliance Gaming Corp.*,
504 F.3d 1356 (Fed. Cir. 2007) ............................................................................... 54

*Dici v. Pennsylvania*,
91 F.3d 542 (3d Cir.1996) ........................................................................................ 27

*e.Digital Corp. v. Futurewei Technologies, Inc.*,
772 F.3d 723 (Fed. Cir. 2014) .................................................................................. 26

*Eon Corp. IP Holdings LLC v. Silver Spring Networks, Inc.*,
815 F.3d 1314 (Fed. Cir. 2016) ............................................................................... 32

*Epcon Gas Sys. Inc. v. Bauer Compressors, Inc.*,
279 F.3d 1022 (Fed. Cir. 2002) ............................................................................... 42

*Exxon Chem. Patents v. Lubrizol*,
64 F.3d 1553 (Fed. Cir. 1995) ................................................................................. 25

*Forest Labs., Inc. v. Teva Pharm. USA Inc.*,
No. CV 14-121-LPS, 2016 WL 3606177 (D. Del. May 25, 2016) ............................ 27

*Golden Bridge Tech., Inc. v. Apple Inc.*,
937 F. Supp. 2d 490 (D. Del. 2013) ......................................................................... 29

*Hawksbill Sea Turtle v. FEMA*,
126 F.3d 461 (3d Cir.1997) ............................................................................... 27, 29

*Hill-Rom Servs. v. Stryker*,
755 F.3d 1367 (Fed. Cir. 2014) ............................................................................... 25

*Howmedica Osteonics v. Wright Medical*,
540 F.3d 1337 (Fed. Cir. 2008) ............................................................................... 44

*In re Longi*,
759 F.2d 887 (Fed. Cir. 1985) ................................................................................. 20

*Intellicall v. Phonometrics*,
   952 F.2d 1384 (Fed. Cir. 1992) ........................................................................ 25
*IP Innovation LLC v. Mitsubishi Elec. Corp.*,
   No. 08 C 393, 2009 U.S. Dist. LEXIS 100647 (N.D. Ill. Oct. 29, 2009) ............................... 16
*Jean Alexander Cosmetics, Inc. v. L'Oreal USA, Inc.*,
   458 F.3d 244 (3d Cir. 2006) ........................................................................... 30
*JumpSport v. Academy*,
   2018 WL 4090471 (E.D. Tex. Aug. 28, 2018) ........................................................ 30
*Kara Tech. v. Stamps.com*,
   582 F.3d 1341 (Fed. Cir. 2009) ....................................................................... 42
*Liebel–Flarsheim v. Medrad*,
   358 F.3d 898 (Fed. Cir. 2004) ......................................................................... 25
*Markman v. Westview Instruments*,
   517 U.S. 370, 116 S. Ct. 1384 (1996) ................................................................. 47
*Martek Biosciences v. Nutri-nova*,
   579 F.3d 1363 (Fed. Cir. 2009) .................................................................. 25, 43
*Merck v. Teva Pharms.*,
   395 F.3d 1364 (Fed. Cir. 2005) ....................................................................... 25
*MyMail, Ltd. v. America Online, Inc.*,
   476 F.3d 1372 (2007) .............................................. 4, 15, 31, 36, 37, 38, 45, 47
*MyMail, Ltd. v. America Online, Inc., et al*,
   No. 6:04-cv-00189-LED (E.D. Tex.) ... 3, 4, 5, 15, 17, 18, 19, 20, 21, 22, 28, 29, 30, 31, 32, 33,
   34, 36, 37, 43, 44, 51, 53, 54, 55, 61
*Mymail, Ltd. v. Earthlink, Inc.*,
   No. 6:04-CV-189, 2005 U.S. Dist. LEXIS 40687 (E.D. Tex. Oct. 28, 2005) ......................... 15
*Nations v. Sun Oil Co. (Delaware)*,
   705 F.2d 742 (5th Cir. 1983) .......................................................................... 30
*Novartis Pharmaceuticals Corp. v. Abbott Laboratories*,
   375 F.3d 1328 (Fed.Cir.2004) ......................................................................... 27
*O2 Micro v. Beyond Innov.*,
   521 F.3d 1351 (Fed. Cir. 2008) ...................................................... 21, 31, 32, 58
*Omega Eng'g v. Raytek*,
   334 F.3d 1314 (Fed. Cir. 2003) .................................................................. 24, 42
*Oracle Corp. v. Parallel Networks, LLC*,
   375 Fed. Appx. 36 (Fed. Cir. 2010) ................................................................... 27
*Oracle Corp. v. Parallel Networks, LLP*,
   588 F. Supp. 2d 549 (D. Del. 2008), *vacated sub nom. Oracle Corp. v. Parallel Networks,
   LLC*, 375 Fed. Appx. 36 (Fed. Cir. 2010) .......................................................... 27
*Parklane Hosiery Co. v. Shore*,
   439 U.S. 322, 99 S. Ct. 645, 58 L.Ed. 2d 552 (1979) ............................................... 30
*Pause Tech. v. TiVo*,
   419 F.3d 1326 (Fed. Cir. 2005) ....................................................................... 25
*Phillips v. AWH*,
   415 F.3d 1303 (Fed. Cir. 2005) ....................................................................... 24
*Power Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc.*, Civ. No. 08–309, 2009 WL
   4928029 (D. Del. Dec. 19, 2009) ..................................................................... 29

*Prism Techs., LLC v. Adobe Sys.*,
 No. 8:10CV220, 2011 U.S. Dist. LEXIS 58434 (D. Neb. June 1, 2011) ................................ 16
*Retractable Techs., Inc. v. Becton*,
 653 F.3d 1296 (Fed. Cir. 2011) ........................................................................................ 62
*RF Delaware, Inc. v. Pacific Keystone Technologies, Inc.*,
 326 F.3d 1255 (Fed. Cir. 2003) ........................................................................................ 26
*SciMed v. Advanced Cardio.*,
 242 F.3d 1337 (Fed. Cir. 2001) ........................................................................................ 43
*Sherwin-Williams Co. v. PPG Indus., Inc.*,
 No. CV 17-01023, 2018 WL 3845239 (W.D. Pa. Aug. 13, 2018) .......................................... 28
*SightSound Techs., LLC v. Apple Inc.*,
 809 F.3d 1307 (Fed. Cir. 2015) ........................................................................................ 28
*Thorner v. Sony Computer Entm't Am.*,
 669 F.3d 1362 (Fed. Cir. 2012) ........................................................................................ 25
*Vectura Ltd. v. GlaxoSmithKline LLC*,
 2018 WL 4700222 (D. Del. Oct. 1, 2018) ........................................................................... 43
*Vitronics Corp. v. Conceptronic, Inc.*,
 90 F.3d 1576 (Fed.Cir.1996) ............................................................................................ 16
*Yodlee, Inc. v. Plaid Techs., Inc.*,
 2016 WL 204372 (D. Del. Jan. 15, 2016) ........................................... 17, 21, 25, 26, 27, 41, 53

**Other Authorities**
Merriam-Webster, Definition of "network" at https://www.merriam-
 webster.com/dictionary/network .......................................................................................... 55
Merriam-Webster, Definition of "network" at https://www.merriam-
 webster.com/dictionary/reaccess .......................................................................................... 61
Merriam-Webster, Definition of "network" at https://www.merriam-
 webster.com/dictionary/reconnect ........................................................................................ 61
MICROSOFT PRESS COMPUTER DICTIONARY (3d ed. 1997), Definition of "network" .................. 56
Technopedia, Definition of "network" at https://www.techopedia.com/definition/5537/network 55

## I. INTRODUCTION

### A. *MyMail's Opening Introduction*

In this case, Plaintiff MyMail contends that Defendant Netgear infringes claim 5 of U.S. Patent No. ("USP") 8,732,318 (the "'318 patent" or "patent-in-suit"). Ex. 1.

#### 1. *The '318 patent-in-suit*

The '318 patent claims priority to provisional application 60/050,186 (Ex. 2), filed June 19, 1997 and is a divisional of application 09/100,619, filed on June 19, 1998, now USP 6,571,290 (the "'290 patent"; Ex. 3). Claim 5 "relates to network connections"; "applies to any network," such as the Internet; "supports many types of physical connections such as telephone dial-up connections, ISDN connections, Ethernet, and other local area networking connections"; and "allows systems to be independently, transparently and dynamically [] reconnected to a network." Ex. 1 at 4:54-55 & 5:32-34. The embodiments in the '318 specification often speak in terms of the Internet. *Id*. at 4:55-58. However, "while Internet terms such as ISP are used throughout … the invention is operable with any network or portion of any network and thus terms such as NSP (Network Service Provider) have been coined for use in the claims to identify similar or analogous systems and devices." *Id*. at 5:39-44. Networks include LANS. *Id*. at 1:50-52 & 2:35-39.

The '318 patent uses the term "ISP" – "Internet service provider" and "NSP" or "network service provider," multiple times. An NSP provides a connection to any type of network. '318/5:42:44; 6:5-15 & Cl. 1-5.[1] Users use access information, which is used to authenticate their right to connect to the network via the NSP. *Id*. at 6:43-45. Such access information comprises "information required by the user to gain access to the network," and may include, but is not

---

[1] When citing the specification's use of ISP and "Internet," this Brief will generally use "NSP" and "network" to help clarify that a reference in the specification to an ISP encompasses an NSP, and that a reference in the specification to the "Internet" encompasses any network.

limited to, an access telephone number, a Password Authentication Protocol (PAP) ID, a PAP password, and/or additional NSP specific information required by the user to gain access to the network." *Id*. at 6:35-51. In some embodiments, an NSP uses the access information to authenticate the user, while, in others, authentication is performed by an authentication server or by a database. *See Id*. at 6:67-7:21, 7:3-8, 23:48-62, 27:30-34, & Fig. 2 (disclosing access service provider 106 comprising network server/DB 220). Authentication can be done by the "authentication portion" of a server, such as server 1154 in Fig. 20, outside the NAP's (here, NSP's) cloud. *Id*. at 27:53-56 & Fig. 20. In certain embodiments, an "[ISP] access service or access service provider (ASP)" is connected to the network. *Id*. at 7:28-30; Cl. 1-5. An "[ISP] access service" is, by its plain meaning, an ISP providing an access service. An embodiment of this is described, as noted below. *See Id*. at 23:52-61. An "ISP access service" and ASP both provide network access information to users (*id*. at 7:48-56); however, the "ISP access service" is specifically provided by the "internet service provider," meaning it is also provided by a NSP. *Id*. at 7:28-30. Such access information may comprise a PAPID, a PAP password, configuration information, and other information required by user 110 to gain access to the network. *Id*. at 6:35-57 & 7:56-8:7. Embodiments include where the "access service" performs authentication for one or more NSPs (*id*. at 23:42-61); the "authentication server" of an NSP serves as the "access service" for that NSP and other NSPs (*id*. at 23:52-61); and a user may disconnect and re-access, or automatically dial and reconnect with an NSP, which may be the same, in which case the user need not be disconnected. *Id*. at 8:8-20.

   2.   *The related '290 patent*

   The '318 patent is a divisional of the '290 patent. Being divisionals, they have the same specification, including figures. However, certain '290 claims have significant differences with the '318 claims. For example, independent '290 claim 13 is directed to a method of connecting a user a NSP comprising providing to a user an initializing set of identification information; establishing

communication with an "access SP (Service Provider)" on the network through an initialization NSP by using the initializing set of identification information; receiving and storing a customized set of identification information from the access SP for different NSP; breaking communication with the initialization NSP; and re-establishing communication with the network through said different NSP using the customized set of identification information. In other words, the ASP is on a network with an initialization NSP, and the initialization NSP is different from NSP that is accessed using the customized set of identification information. In some '290 claims, the NSP and ASP are on the same network. In others, they are on a different ones.

3. *Prior district court claim construction proceedings involving the related '290 patent.*

Previously, MyMail asserted claims 1-8 and 11-13 of the '290 patent against America Online, Inc. ("AOL") and others. *See Markman* Brief in *MyMail, Ltd. v. America Online, Inc., et al*, No. 6:04-cv-00189-LED (the "*AOL* case"), Doc. 169 (Ex. 4). In June 2005, Eastern District of Texas court issued a Memorandum Opinion construing certain terms, in context, of the '290 patent. *AOL* case, Doc. 198 (Ex. 12). That court construed, inter alia, "network" as "a system of interconnected computers that have the ability to communicate"; "disconnect" as "to sever or interrupt a connection"; "NSP (network service provider)" as "a party that provides a connection to the network and authenticates users for access to the network"; and "access SP; access service provider; access service; ASP" as "a party that provides authenticated access information to a user through the network to enable the user to access one or more NSPs." *Id*. at Appx B.

4. *Prior district court summary judgment proceedings involving the related '290 patent.*

In the prior *AOL* case, multiple defendants obtained summary judgment of noninfringement. *See, e.g.*, *AOL* case, Doc. 426. Earthlink and MyMail disputed whether Earthlink's third-party modems from its providers, which, under MyMail's theory of that case, operated as NSPs, authenticated users. *Id*. at 2-3 & 6-7. The district court held Earthlink's third-

party modems, which MyMail's contended operated as NSPs, did not authenticate users, and, thus, were not NSPs, and granted summary judgment in favor of Earthlink because these third-party accused devices did not comport with MyMail's infringement theory under the asserted '290 claims. *Id*. at 6-7.

5. *Prior appellate proceedings involving the related '290 patent.*

MyMail appealed this ruling and, specifically, the authentication requirement. *MyMail, Ltd. v. America Online, Inc.*, 476 F.3d 1372, 1374 (2007) (the "*AOL* appeal") ("The issue on appeal relates to the authentication requirement."). The Federal Circuit affirmed that, including in view of MyMail's infringement theory, authentication is a required NSP function and "the functions performed by the NSP in the defendants' systems do not constitute authentication." *Id*. In so holding, the court dismissed an embodiment MyMail had relied upon below, wherein a centralized ASP performed authentication, because, during the district court proceedings, MyMail had "conceded" it to be part of an "unclaimed invention" of the asserted '290 claims. *Id*. at 1377. For example, asserted '290 claim 1 comprises "storing…login-in information supplied by sad [sic] access service for accessing said given NSP"; '290 claim 6 comprises "providing to the user from the access service provider information indicating a second access telephone number for a given NSP"; '290 claim 9 comprises "retrieving service provider specific data from said at least one database for use in accessing at least a portion of the network"; '290 claim 12 comprises "storing a hidden set of login data in said network accessing device obtained from said access service"; and '290 claim 13 comprises "receiving and storing a customized set of identification from said access SP." No such concession has been made here, including for asserted '318 claim 5. Nor does any such concession related to these different '290 claims relate to the '318 claims, including asserted claim 5.

6. *Prosecution history of the '318 patent.*

The '318 prosecution history was not considered in the *AOL* case. During the '318 prosecution, the PTO issued an office action on February 7, 2006 rejecting then-pending claims 1-3 as anticipated by EP 0 336 079 A2 to Zdunek ("Zdunek"). Ex. 5 at MYM000434-MYM000439; *see* Ex. 6 (Zdunek). The PTO stated Zdunek disclosed an access service at cl. 5, lns. 40-48. Ex. 5 at MYM000437. At cl. 5, lns. 40-48, Zdunek discloses a "suitable memory device." Ex. 6 at 5:38-48. In this February 2006 office action, the PTO also rejected then-pending claims 2 and 3 as anticipated by USP 5,812,819 to Rodwin ("Rodwin"), rejecting then-pending claim 2 because Rodwin disclosed a network service provider at cl. 4, lns. 48-56 and cl. 5, lns. 10-20; an access service databank at cl. 5, lns. 20-53; and an NSP at cl. 8, lns. 22-39. Ex. 5 at MYM000437-MYM000438; *see* Ex. 7 (Rodwin). At cl. 4, lns. 48-56, Rodwin discloses a network manager that assigns a code to a user of a remote computer on that network. Ex. 7 at 4:48-56. At cl. 5, lns. 10-20, Rodwin discloses a user accessing a network after being authenticated by an authentication server database located on the network. *Id*. at 5:10-20. At cl. 5, lns. 20-53, Rodwin discloses a DHCP server that provides IP addresses over a network to remote computers accessing that network *Id*. at 5:20-53. At cl. 8, lns. 22-39, Rodwin discloses remote computers accessing the same network that includes the DHCP server. *Id*. at 8:22-39. In rejecting then pending claim 3, the PTO repeated that Rodwin disclosed an access provider at cl. 5, lns. 20-53 and an NSP at cl. 8, lns. 22-39. Ex. 5 at MYM000437-MYM000438.

In a July 26, 2006 examiner interview, the applicant argued Zdunek did not disclose "determining that he second user is using the login data," and an IP address was not network access data. *Id*. at MYM000470. However, the applicant did not argue a PAP ID or PAP password were required for network access data, nor did it argue Zdunek or Rodwin did not otherwise disclose what the PTO stated they disclose. *Id*. In its July 31, 2006 response to the February 2006 office

action, the applicant referenced the July 26, 2006 interview, and, again, did not argue a PAP ID or PAP password were required for network access data, and again did not argue Zdunek or Rodwin did not otherwise disclose what the PTO stated they disclose. *Id*. at MYM000468-MYM000462.

The PTO issued another office action on October 23, 2006, finding claims 1, 2, and 5 were allowable, but rejecting then-pending claim 3 as obvious over USP 5,751,812 to Anderson ("Anderson") in view of USP 5,898,780 to Liu ("Liu"). *Id*. at MYM000475-MYM000482; MYM000487; *see* Exs. 8 (Anderson) & 9 (Liu). The PTO stated Anderson disclosed an NSP at cl. 6, lns. 2-9 and Liu disclosed an access provider at cl. 3, lns. 2-9. Ex. 5 at MYM000478. At cl. 6, lns. 2-9, Anderson discloses a network server. Ex. 8 at 5:51-6:11. At cl. 3, lns. 2-9, Liu discloses an authentication server. Ex. 9 at 2:66-3:9. In making its obvious rejection, the PTO stated "it would have been obvious to one of ordinary skill in the art…that incorporating an access provider in Anderson's network service provider would have improved system robustness." Ex. 5 at MYM000478. In other words, the PTO argued that pending claim 3 could be satisfied by a network server incorporating an authentication server, which would involve a single piece of equipment and which would reside on the same network.

On December 6, 2006, a second examiner interview occurred. *Id*. at MYM000483-MYM000485. During this interview, the applicant discussed a "user tier" concept which was "not represented int eh claims, and it proposed to amend the claims to include a network access device. *Id*. The applicant did not argue Anderson did not disclose an NSP or Liu did not disclose an access provider. *Id*. On April 23, 2007, the applicant responded to the October 23, 2006 office action (*id*. at MYM000490-MYM000495), adding the network access device limitation to claim 3 and referencing this interview. *Id*. at MYM000493. Again, the applicant did not argue Anderson did not disclose an NSP or Liu did not disclose an access provider. *Id*. at MYM000493-MYM000495.

The PTO issued another office action on June 13, 2008 allowing claims 1 and 5 but rejecting claims 2 and 3 as anticipated by USP 5,825,890 to Elgamal ("Elgamal"). *Id*. at MYM002690-MYM002696; *see* Ex. 10 (Elgamal). The PTO stated Elgamal disclosed an NSP at cl. 9, lns. 30-50 and access service databank at cl. 9, lns. 51-57 and cl. 8, lns. 63-67. Ex. 5 at MYM002692-MYM002693. At cl. 9, lns. 30-50, Elgamal discloses an Internet server. Ex. 10 at 9:30-50. At cl. 9, lns. 51-57 and cl. 8, lns. 63-67, Elgmal discloses secure SSL sockets for connecting to the same Internet server on the same network. *Id*. at 8:63-67 & 9:46-57.

On March 27, 2009 (after first making a non-compliant amendment), the applicant responded to the June 13, 2008 office action. Ex. 5 at MYM002731-MYM002740. Primarily, the applicant changed the word "data" to the word "information" in pending claims 1-3 and added a limitation to claim 1 that the network access information was "determined to be unused." *Id*. at MYM002732-MYM002733. The applicant also argued Elgamal did not provide access to a network because it only discussed securing private communications between already networked computers and Elgamal did not disclose the newly added limitation of the network access data being "determined to be unused." *Id*. at MYM002734-MYM002737. Further, the applicant noted the new term "information" encompasses "data." *Id*. at MYM002739. However, the applicant did not argue Elgamal did not disclose an NSP or an access service databank, or Elgamal was not invalidating because the NSP and access service databank were on the same network.

The PTO issued another office action on September 4, 2009, again, rejecting claims 1, 3, and 5 as anticipated by USP 6,058,250 to Harwood ("Harwood"). *Id*. at MYM002768-MYM002774; *see* Ex. 11 (Hardwood). In rejecting claim 1 and its dependent claim 5, the PTO again stated Harwood disclosed an access service at cl. 4, lns. 46-53. Ex. 5 at MYM002770-MYM002771. In rejecting claim 3, the PTO again stated that Harwood disclosed an NSP at cl. 2,

lns. 1-7. *Id*. As to claim 1, the examiner refuted the applicant's argument that Harwood did not disclose access being denied because another user is presently using the log-in information. *Id*. at MYM002772. As to claim 3, the examiner refuted that the "via the network" limitation was not met by Harwood. *Id*. at MYM002772-MYM002773.

On March 4, 2010, the applicant responded to the September 4, 2009 office action. *Id*. at MYM002804-MYM002825. In this response, the applicant again argued Harwood lacked the claim 1 limitations of "when the user, during a subsequent network log-in attempt, is denied access because another user is presently using said first log-in information" and the claim 3 limitations of "modifying a stored set of network access information using new information downloaded, via the network" and "reaccessing the network." *Id*. at MYM002814-MYM002817 & MYM002820-MYM002824. Here, the applicant cited disclosures from the specification for an embodiment wherein a user's computer downloads, via the Internet, log-in information for an ISP, modifies the computer's connection parameters using the log-information for the ISP, and reconnects to the Internet using the modified connection parameters. *Id*.; see Ex. 1 at 7:28-8:29. In other words, all of the access service, the user's computer, and the ISP are on the same network, *i.e.*, the Internet. As noted by the applicant,

> The present disclosure supports the limitations "modifying a stored set of network access information using new information downloaded, **via the network**," and "**reaccessing the network**… using the modified set of network access information." (Emphasis added). The user's computer may download information from the access service *via the Internet* and modify the stored connection parameters using the downloaded information. The user's computer may then *re-access the Internet* using the modified parameters. *The Internet* is the recited network in both cases.

Ex. 5 at MYM002823-MYM002824 (emphasis in original). The foregoing response occurred after a final office action, so, on May 4, 2010, the applicant filed an appeal brief with the Board of Patent Appeals and Interferences (the "BPAI") in order to proceed. *Id*. at MYM002826-MYM002920.

The applicant's appeal brief essentially repeated the arguments made in its March 4, 2010 office action response. *Id*. On September 2, 2010, the PTO filed a responsive appellate brief styled an "Examiner's Answer" largely repeating the arguments made in the September 4, 2009 office action being appealed. *Id*. at MYM002961-MYM002977. On November 10, 2010, the applicant filed a reply brief repeating arguments consistent with the applicant's appeal brief and March 4, 2010 office action response. *Id*. at MYM002985-MYM003001.

On April 4, 2013, the BPAI rendered its "Decision on Appeal." *Id*. at MYM003033-MYM003042. As to claim 1 and its dependent claim 5, the BPAI agreed with the applicant that Harwood did not disclose the limitations noted above, and thereafter the '318 patent. *Id*.

## B.  *NETGEAR's Response Introduction*

This is not the first time these terms have been construed. In litigation over ten years ago, MyMail and a host of defendants received constructions on most of these terms. The defendants were granted a summary judgment of non-infringement, and MyMail appealed. The Federal Circuit affirmed the defendants' victory.

That round of litigation involved the parent of the patent-in-suit, U.S. Patent No. 6,571,290 (the "'290 Patent," Ex. 3). Afterward, MyMail sought issuance of U.S. Patent No. 8,732,318 (the "'318 Patent," Ex. 1) at issue here. During prosecution of the '318 Patent, MyMail submitted all of the *Markman* briefs, the claim construction order, and the Federal Circuit decision relating to the '290 Patent to the Patent Office. The Examiner checked off on each of those items, indicating his review. Thus, the earlier claim construction decisions are not simply related decisions. They are part of the '318 Patent prosecution history—the intrinsic record in this case.

MyMail now sues NETGEAR on that '318 Patent—which has the same specification, claims essentially the same subject matter, and includes a terminal disclaimer to the '290 Patent.

But MyMail has a problem. The given constructions and intrinsic record are detrimental to

its infringement claims here. Indeed, those constructions cannot support infringement as a matter of law. Undeterred, MyMail continues its pursuit of infringement while running from the given constructions and intrinsic record.

Even a cursory review of the claim terms shows MyMail's predicament:

| Claim term | MyMail's proposed '290 construction[2] | The '290 court's construction | NETGEAR's proposed '318 construction | MyMail's proposed '318 construction |
|---|---|---|---|---|
| network service provider or NSP | a party other than the ASP that provides the actual connection to the network | a party that provides a connection to the network and authenticates users for access to the network | a party that provides a connection to the network and authenticates users for access to the network | Hardware and/or software that provides a connection to a network. |
| access provider (synonymous with "access service" from the '290 litigation) | a party that offers network access service to the user via one or more NSPs | a party that provides authenticated access information to a user through the network to enable the user to access one or more NSPs | a party that provides authenticated access information to a user through the network to enable the user to access one or more NSPs | Hardware and/or software that provides network access information. |
| network access information (synonymous with "set of identification information" from the '290 litigation) | information reflecting a user's identity, such as a PAP ID, used to authenticate the user's right to communicate with an ASP via an NSP | information reflecting a user's identity, such as a PAP ID or PAP password, used to authenticate the user's right to communicate with the network | information reflecting a user's identity, such as a PAP ID or PAP password, used to authenticate the user's right to communicate with the network | Plain and ordinary meaning, including in context. No construction necessary. |
| network | an interconnected group of uniquely-identified computers | a system of interconnected computers that have the ability to communicate | A system of interconnected computers that have the ability to communicate.

The claimed network is located | Plain and ordinary meaning, including in context. No construction necessary. |

_____

[2] Ex. 4, Pl.'s '290 *Markman* Brief.

|  |  |  | between the access provider and the network service provider. |  |
|--|--|--|--|--|

MyMail's efforts to re-write the record and patent are transparent. MyMail replaces "party" with the virtually limitless "hardware and/or software"—and this when ***MyMail itself*** proposed the word "party" in the first place. NETGEAR adopts the prior constructions.

Of course, MyMail has good reason to run away from those constructions. The subject matter of both the '290 and '318 Patents is to a process that divides responsibility between parties for providing Internet access. Essentially, an access service provides information over the Internet to the users' computers to allow Internet access through different Internet Service Providers (ISPs), like the defendants (*e.g.* AOL) in the '290 matter. The earlier constructions embody those concepts. But now, MyMail accuses NETGEAR's routers of containing all of those "parties"—access provider, network service provider, etc. This argument is a non-starter based on the earlier constructions.

But MyMail cannot avoid those earlier constructions—constructions which are part of the intrinsic record. It used essentially the same terms as previously construed, and nowhere disclaimed those litigated meanings.

And those earlier constructions were correct. They reflect the alleged invention as described in the patent, and they capture the concepts of the specification. MyMail's new constructions have little to do with the originally-disclosed subject matter.

1. *Background of the '318 and '290 Patents*

The claimed invention dates back to the bygone era of dial-up internet. Though the specification discusses the invention in the context of the Internet, the claim language uses terms

such as *network* and *network service provider (NSP)* in place of *internet* and *internet service provider (ISP)*.

When the patent was first filed in the late 90s, users would access the Internet through a dial-up connection to a local network service provider. Being a local network service provider, the connection would be a cheap local call. But when traveling, that cheap local call to the user's usual network service provider became an expensive long distance call.

One solution was for users to sign up for another network service provider local to their new location, to again access to the Internet using a cheap local call. The objective of the '290 and '318 Patents was to automate this process. Users would briefly connect to the Internet through a long distance call to their home network service provider, then download (from an access service) a new set of access credentials for a local network service provider, and then re-connect to the Internet through the local network service provider using those new credentials.



Figure 1 of the '318 Patent (Ex. 1 at MYM000023) illustrates this process. An annotated version of this figure is above on the left, with a simplified version to its right. In these figures, the

Internet is the network (pink), the Internet Service Providers (ISPs) are the network service providers (NSPs), the Access Service Provider is the access provider, and the User is the network access device. As illustrated in the figures, the user can potentially access the network/Internet through a variety of network service providers (NSPs).

According to the patent, the network access device initially accesses the network through a predetermined network service provider, (Ex. 1, '318 Patent, at 6:58-7:27), and then downloads network access information from the access provider, via the network/Internet, to the user device—see the red line from the Access Service Provider to the User by way of the network/Internet. *Id*. at 7:53-56. Using this new network access information, the user's network access device then re-accesses the network/Internet via another network service provider (NSP/ISP)—see the red line connecting the User to the network/Internet via the NSP/ISP. *Id*. at 7:56-59, 8:30-51.

If the network service provider has not changed—such as if the user is still at home—then nothing else would need to happen. In this case, the user just remains connected to the predetermined network service provider and would not need to re-access the network. *Id*. at 8:16-20.

2. *Asserted Claim 5 of the '318 Patent*

The asserted claim—claim 5—covers the technique discussed above:

> 5. A method of obtaining a set of network access information comprising the steps of:
>
> modifying a stored set of network access information using new information downloaded, via the network, to a network access device from an access provider connected to said network; and
>
> the network access device re-accessing the network via a given network service provider (NSP) using the modified set of network access information.

In claim 5, the user is already connected to the network. The claimed method downloads new

information from an access provider to the user's device via the network, and then re-accesses the network via a network service provider based on that modified network access information. In the context of a typical use case as discussed above, a travelling user briefly accesses the network (such as through a long-distance call to their home network service provider) and downloads a new set of access credentials for a local network service provider. The user's computer then re-accesses the network via the local network service provider.

3. *The Parent '290 Patent*

The '318 Patent is a divisional of the '290 Patent. As such, the '318 and '290 Patents share the same specification and have similar claims. All of the terms here appear in some form or fashion in the claims of the '290 Patent. Claim 11 of the '290 Patent is particularly similar[3] to claim 5 of the '318 Patent—they both involve downloading new information from an access provider via the network and re-accessing the network via a given network service provider. The only difference is that claim 5 of the '318 Patent does not expressly recite the initial connection to the predetermined network service provider:

| '318 divisional patent claim 5 | '290 parent patent claim 11 |
| --- | --- |
| A method of obtaining a set of network access information comprising the steps of: | A method of obtaining access to a network comprising the steps of: |
| | accessing the network via an available ***network service provider*** (NSP) using a previously provided set of log-in data; |
| modifying a stored set of network access information using new information downloaded, via the network, to a network access device from an ***access provider*** connected to said network; and | communicating with an ***access service***; storing a modified set of log-in data received from said access service; |
| the network access device re-accessing the network via a given network service | disconnecting from the network; and using said modified set of log-in data |

---

[3] The Patent Office in fact rejected claim 5 (filed as claim 3) over claims 11-13 of the '290 Patent for double patenting. MyMail responded by filing a terminal disclaimer. Ex. 5, '318 Patent file history at MYM000221, 242, 248-49.

| | |
|---|---|
| provider (**NSP**) using the modified set of network access information. | when next accessing the network via a given **NSP**. |

MyMail previously asserted the '290 Patent, including claim 11, against several parties (the "'290 litigation") in the Eastern District of Texas. *See MyMail, LTD. v. Am. Online, Inc.*, No. 6:04-CV-189 (E.D. Tex.). In that litigation, the court construed nearly all of the terms (or similar terms) at issue in this case,[4] and NETGEAR remains faithful to those constructions. Based on those constructions, the court granted the defendants' non-infringement motion for summary judgment.[5] MyMail appealed that decision to the Federal Circuit, which affirmed the '290 judgment. *See MyMail, Ltd. v. Am. Online, Inc.*, 476 F.3d 1372, 1376 (Fed. Cir. 2007).

That lawsuit was resolved well before the '318 Patent issued in 2014. During the prosecution of the '318 Patent, MyMail itself submitted to the Patent Office an Information Disclosure Statement with copies of the parties briefing, the '290 claim construction order, the '290 judgment, and the Federal Circuit's decision. Ex. 5 at MYM000503. MyMail even included both of those decisions as exhibits to an appeal brief filed in the Patent Office. *Id.* at MYM002841-2920 (specifically, MYM002871-2894, the '290 claim construction; MYM002907-2920, the Federal Circuit decision). These documents are part of the prosecution history, and hence the intrinsic evidence.

In short, many of the terms at issue in the present litigation have been construed. The constructions were decided in the context of the same specification as the '318 Patent, and in light of a previously asserted claim which is nearly identical to the presently asserted claim. The constructions are part of the file history of the '318 Patent, and they were among the evidence

---

[4] *Mymail, LTD. v. Am. Online, Inc.*, No. 6:04-CV-189, 2005 U.S. Dist. LEXIS 40716 (E.D. Tex. June 3, 2005), also found at Ex. 12 and Ex. 5 at MYM002871-2894.
[5] *Mymail, Ltd. v. Earthlink, Inc.*, No. 6:04-CV-189, 2005 U.S. Dist. LEXIS 40687, *21 (E.D. Tex. Oct. 28, 2005), also found at Ex. 5 at MYM002895-2906.

considered by the Patent Office when allowing the claim that MyMail now asserts against NETGEAR.[6] Based on this intrinsic evidence, these constructions are essentially defined terms.

## C. *MyMail's Reply Introduction*

### 1. *Patented Technology*

Defendant's description of the '318 patent wrongly focuses on some embodiments, excluding others falling within the claims, *e.g.*, those involving an "internet access service provider access service" (*i.e.*, an ISP (or NSP) as the access provider), re-accessing the same NSP, and the NSP not being the authenticator. '318/7:28-30, 8:8-16, & 23:52-61. Defendant also ignores relevant evidence from the '318 prosecution. *See* below.

### 2. *Issue Preclusion*

As noted below, estoppel does not apply. Defendant's attempt to link the '318 claims with the markedly different '290 claims fails. For example, '290 (a) claim 3 has first link with an ASP and second link with a NSP, with the ASP and NSP on different networks; (b) claim 6 has one access number for an ASP via an "available NSP" and a second access number for a different "given NSP"; (c) claim 11 similarly involves accessing a network via an "available NSP," disconnecting, and next accessing via a "given NSP"; and (d) claim 13 involves communicating with an ASP on a network through an "initialization NSP," breaking communication, and re-establishing it through a "selected NSP." Defendant purports to rely upon similarities between '290 claim 13 and '318 claim 5, but they are substantially different:

---

[6] *See, e.g.*, *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1583 (Fed.Cir.1996) (file history of a patent "contains the complete record of all proceedings before the Patent and Trademark Office. . . ."); *Prism Techs., LLC v. Adobe Sys.*, No. 8:10CV220, 2011 U.S. Dist. LEXIS 58434, *19 (D. Neb. June 1, 2011) (prior claim construction memorandum and order submitted to Patent Office became part of the prosecution history); *IP Innovation LLC v. Mitsubishi Elec. Corp.*, No. 08 C 393, 2009 U.S. Dist. LEXIS 100647, *10-11 (N.D. Ill. Oct. 29, 2009) ("the prior constructions are part of the prosecution history in this case").

~~115~~. A method of obtaining a set of network access ~~to a network~~information comprising the steps of: ~~accessing~~ modifying a stored set of network access information using new information downloaded, via the network ~~via an available network service provider (NSP) using a previously provided set of log-in data; communicating with an access service; storing a modified set of log-in data received from said~~, to a network access ~~service; disconnecting from~~ device from an access provider connected to said network; ~~and~~ the network~~; and using said modified set of log-in data when next~~ access device re-~~accessing the network via a given ~~NSP.~~ network service provider (NSP) using the modified set of network access information.

*C.f.*, '290 claim 13; '318 claim 5. In at least the above '290 claims (but no '318 claims), the second NSP must do the authenticating, and be separate from the ASP, including since the ASP is on a different network from the second NSP. Any alleged "admissions" by MyMail in the *AOL* case were in the context of the '290 claims at issue in that case, not the '318 claims, *e.g.*, '318 claim 5.

Further, here, Defendant seeks to alter the scope of NSP and ASP from the prior '290 litigation by dramatically modifying the construction of the term "network." This "network" issue is addressed below. If anything, Defendant's unwarranted attempt to modify the prior constructions of NSP and ASP with its unwarranted restriction on "network" should constitute waiver or estoppel on its ability to rely upon estoppel for NSP or ASP. Further, Defendant does not dispute estoppel is discretionary here, and that this Court is not bound by constructions from prior decisions involving the '290 patent which it deems inapplicable to the '318 claims. The proper course is to construe the '318 terms in the context of the '318 patent and relevant intrinsic evidence. Further, Defendant does not dispute estoppel is discretionary here, and that this Court is not bound by constructions from prior decisions involving the '290 patent which it deems inapplicable to the '318 claims. *See A.B. Dick Co. v. Burroughs Corp.*, 713 F.2d 700, 702 (Fed. Cir. 1983); *Yodlee, Inc. v. Plaid Techs., Inc.*, 2016 WL 204372, *4 (D. Del. Jan. 15, 2016). The proper course is to construe the '318 terms in the context of the '318 patent and relevant intrinsic evidence

  a.  The issues under consideration now are not identical to previously-litigated issues

Firstly, including as noted prior, there are many differences in the scope of the '290 claims

and '318 claims – highly disfavoring application of estoppel when the terms are properly viewed in context of the relevant claims. Defendant overstretches when alleging MyMail "admitted" the "NSP performs authentication" at the *AOL* case hearing. Resp.Br. at 8. Rather, "[t]he context makes clear that counsel's statement refers to the scope of the claims; counsel acknowledged that under the patent the 'NSP has to do [authentication].'" Ex. 5 at MYM002917. Indeed, this prior counsel argued on the '290 claim scope – the issue being heard. Including as noted prior, that scope is quite different from the '318 claim scope, namely at-issue claim 5, including since '318 claim 5 does not require the noted distinctions. Defendant also ignores the substantial '318 prosecution history noted in the Op.Br., showing no requirement the NSP be the authenticator. Op.Br. at 7-11 & 20-21. Further, claim 5 "network access device re-accessing the network via a given…(NSP) using the modified set of network access information" requirement does not mandate or imply the NSP authenticates. As noted, a specific embodiment states the NSP can rely on, *e.g.*, another NSP, access provider, ASP, or "centrally located database point" to authenticate. '318/23:52-61.

Further, the '318 specification includes an embodiment where the ASP, not NSP, authenticates, and '318 claims, including asserted claim 5, are agnostic to whether the NSP or ASP authenticates. *See id.*, 23:42-61 & Claim 5. Both sides agree MyMail only conceded this was an unclaimed embodiment in the *AOL* case – unsurprising since the '290 claims barred the ASP from being, and required the NSP be, the authenticator. Defendant also argues the prior '290 rulings were part of the '290 file history and, thus, intrinsic evidence to consider in claim construction. Yet, for '318 claim 5, the patentee chose "access provider" (not ASP), a term not previously construed. This different "access provider" term's use should not be burdened by construction of the different ASP term of the *AOL* case. Further, construction of NSP in the *AOL* case was linked to construction of ASP, and, particularly, that an NSP would authenticate under the '290 claims as

written. The new "access provider" term necessitates its own construction, as well as construction of NSP unburdened from the *AOL* case constructions, which are tied to the '290, not '318, claims.

Further, while Defendant erroneously focuses merely on "claim construction," generally, as the issue under consideration, the true issue, as MyMail notes, is the specific issue of whether a "party" comprises hardware and/or software. Simply put, MyMail's proposed construction of NSP is wholly consistent with the *AOL* case constructions, merely requesting this Court further construe this term given the parties' further dispute as to what a "party" in the *AOL* case construction entails, and if it comprises hardware and/or software. Such further construction avoids ambiguity in the term "party" in Defendant's proposed construction (and *AOL* case construction). Notably, other than wrongly arguing their flawed "issue" was already determined, Defendant offers *no argument* as to *why* a *"party" does not comprise* hardware and/or software. Rather, Defendant simply cites various parts of the specification merely stating what has already been determined – an NSP and ASP are "parties," yet these citations fail to support Defendant's ultimate conclusion "party" does not comprise hardware and/or software. Further, while Defendant continually argues MyMail should be held to its arguments in the *AOL* case, Defendant wholly ignores the fact MyMail clearly, in that case, held the theory Earthlink's hardware and/or software (*e.g.*, the "party") performed the claimed functions. *See* Op.Br. at 5-6. Nor does any alleged agreement, in the *AOL* case, an NSP is a *party* somehow lead to agreement, on an issue not in that case, a party does not comprise hardware and/or software. Indeed, Defendant's allegation MyMail conceded an ASP was a "different party" than an NSP during the *AOL* case is misguided. Defendant can point only to MyMail's proposed construction of the term *in the context of the '290 claims* (*see* above), a construction which (a) was not adopted, (b) from which it would be improper to borrow piecemeal, and (c) from which no estoppel could possibly attach, including because it was not adopted.

Moreover, for the "access provider" term, other than unpersuasive attempts to argue the already-construed ASP term is the same as the present "access provider" term, Defendant fails to show *the specific term* "access provider" was previously construed in the *AOL* case. Rather, as noted prior, this term is entirely different from the *AOL* case ASP term, including considering the entirely different claims between the '290 and '318 patents. Further, Defendant's suggestion the statement in the *AOL* ruling of MyMail's theory being "defendants are the ASPs" under the '290 claims misses the point the *AOL* defendants were ASPs *by virtue of their hardware and software*, not solely their corporate status. Similarly, the *AOL* Court's finding the '290 patent "distinguishes the functions of an NSP and ASP" is not informative of whether those "functions" are performed by hardware/software or a corporation. Electronic functions are performed via hardware and/or software. *E.g.*, '318/11:36-38 (noting "functions of the access service 106" are described therein). Defendant misunderstands the import of the terminal disclaimer filed responsive to a rejection for obviousness-type double patenting, which merely prohibits patentees obtaining more claims for "obvious" alterations of previously-patented claims. *In re Longi*, 759 F.2d 887, 892 (Fed. Cir. 1985). Assuming, *arguendo*, at least one '318 claim would be **obvious** over at least one '290 claim, that is not informative of any such claims having the same scope, especially for claim construction purposes. What is informative is comparing the actual, but markedly different, claims.

The actual dispute litigated between the *AOL* parties was whether an NSP, as construed in the '290 claims' context, performed authentication. That is not the same as the present disputes, taking place in the '318 claims' context and where, in this case, there are no admissions by MyMail of unclaimed embodiments or that NSPs must be the authenticating party under the '318 claims. Including as noted prior, factor one is not met. Defendant's also complains MyMail's construction does not include access information being provided "through the network." However, claim 5

already has a separate limitation that such information be downloaded "via the network."

     b.   <u>The issue under consideration, here, was not fully and vigorously litigation previously.</u>

Including for similar reasons as factor one, and as noted in MyMail's Op.Br., factor two is not met because the *current, true specific* dispute was not fully and vigorously litigated in the *AOL* case, and, in fact, was not even addressed. Again, ignoring MyMail's discussion of the factors, Defendant merely cites the *AOL* case, avoiding the true dispute, here. Moreover, at a minimum, as MyMail noted prior, this *further* dispute represents a new, additional dispute as to the proper, full scope of the term NSP, which was not previously litigated and should be resolved by this Court – which Defendant has not disputed. *See O2 Micro v. Beyond Innov.*, 521 F.3d 1351, 1362-63 (Fed. Cir. 2008). This issue simply was not "actually litigated" in the *AOL* case. Nor was the "service provider" term "actually litigated," or even remotely at issue in the *AOL* case.

     c.   <u>The issue under consideration, here, was not necessary to support the prior judgment.</u>

Including for similar reasons as factor one, and as noted in MyMail's Op.Br., factor three is not met because the *current, true specific* dispute was not necessary to the *AOL* case authentication issue serving the basis for judgment, and, in fact, many present issues, *e.g.*, party vs. hardware/software, were not addressed, or even at issue, at all. Again, Defendant simply cites their incorrect, general issue of "claim construction" as the necessary issue for granting summary judgment, yet ignore the requirement the *issue to be collaterally estopped* must have been an essential part of the judgment, not an issue merely considered in, or prior to, the judgment. *See Yodlee*, 2016 WL 204372 at *3-4. The instant issue of whether "party" comprises hardware and/or software played no role in the *AOL* Court's grant of summary judgment. Rather, as noted prior, the actual underlying issue was that, in view of the construction of NSP, MyMail's theory the ASP, under the '290 claims, authenticated was no longer viable. Similarly, the now-disputed "service

provider" term was not even addressed in the *AOL* case, and, thus, could not have served as any issue necessary for rendering summary judgment in that case.

3. *Relevant Intrinsic Evidence*

Defendant relies heavily on papers from the *AOL* case being submitted to the PTO during '318 prosecution. However, no evidence, or even suggestion, exists that such papers played any role in the '318 prosecution aside from being considered along with a multitude of other prior art. Clearly, the most relevant '318 prosecution papers are the office actions and responses, and prior art cited therein. MyMail's Op.Br. goes through those in considerable detail. As noted therein, no disputed limitations urged by Defendant (*e.g.*, NSPs and access providers must be companies and cannot be hardware/software, NSPs and access providers cannot be owned by the same company, the NSP must be the authenticator, access information must identify the user, etc.) were held by the examiner or patentee as '318 claim requirements. This is the most relevant intrinsic evidence and should override Defendant's attempts to bootstrap its claim construction positions onto inapplicable papers from the *AOL* case, which, although part of the voluminous intrinsic evidence, are irrelevant – especially in view of more relevant evidence from the prosecution, namely the scope of the claims and exchanges with the examiner.

**D.  *NETGEAR'S Sur-Reply Introduction***

MyMail used the pages in its initial brief to run away from constructions it previously advanced with respect to the '290 Patent, even though those constructions (adopted in large part by the district court) are part of the intrinsic record for the patent-at-issue here. MyMail now uses its Reply to "counter" arguments and positions never advanced by NETGEAR.

This comes as no surprise. The very definitions MyMail asserted in order to bring suit years ago are devastating to its claims against NETGEAR. The co-inventor and partial owner of MyMail admitted in deposition that MyMail's previous constructions undermine MyMail's positions in this

case.[7] But, the meaning of claim terms does not change based on the company MyMail is currently suing.

NETGEAR's proposed constructions are consistent with the intrinsic record. They are taken, almost verbatim, from the prior district court and Federal Circuit construction of the terms. NETGEAR's proposed constructions should be adopted.

1. *MyMail Mischaracterizes an Evidence Issue as an Estoppel Issue.*

MyMail repeatedly attempts to recharacterize the prior claim constructions as solely an estoppel issue. But that ignores that the prior litigated constructions are also part of the prosecution history, and thus intrinsic evidence. To be clear, estoppel separately applies, even if the earlier constructions had not been made part of the intrinsic record. But as the Federal Circuit has held, one looks to the intrinsic record—including the prosecution history—in construing the claims. And that analysis is independent from any estoppel.

As MyMail states, "[t]he proper course is to construe the '318 terms in the context of the '318 patent and relevant intrinsic evidence." *See* p. 17. *We agree.* We rely on the prior constructions from the '290 litigation because the prior constructions are relevant *intrinsic* evidence—MyMail filed a separate Information Disclosure Statement directed specifically to the '290 Patent litigation and titled "Information Disclosure Statement Relating to *Concluded Litigation"* (emphasis in original). Ex. 5, '318 Patent file history at MYM000503-615. In that filing they cited the district court claim construction and summary judgment opinions, along with the Federal Circuit decision, which all were considered and initialed by the examiner, and included in full in the file history of the '318 Patent. *Id.* at MYM002623, 2646, 2649 & 2870-920. MyMail acknowledges that they are

---

[7] Thomas Selgas, a co-inventor on the '290 and '318 Patents who has a financial interest in the outcome of this case, admitted that MyMail's infringement claim was unreasonable under MyMail's prior constructions. Ex. 16, Dep. of Selgas, T., Aug. 28, 2018, p. 135:18-23; 147:24-148:6; 149:10-12; 16:17-17:2.

included in the intrinsic record and were considered by the examiner. *See* p. 22. Nevertheless, MyMail argues that the prior constructions did not "play[] *any* role in the '318 prosecution aside from being considered along with a multitude of other prior art." *Id.* (emphasis in original). The '318 prosecution history speaks for itself though. And the prosecution history clearly shows that the examiner considered some references—such as the prior constructions—and did not consider others. *Compare* Ex. 5 at MYM002623, MYM002646, MYM002649 *to* Ex. 5 at MYM2587-2595, 2599-2604, 2606-17, 2625-29, 2637. Moreover, the examiner specifically noted in an office action that he had not considered a number of references. Ex. 5 at MYM002570. Had the examiner not considered the prior constructions, that would have been noted in the prosecution history of the '318 Patent.

Throughout its Reply, MyMail downplays the importance of the prior constructions as intrinsic evidence, going so far as to claim that they are not "relevant intrinsic evidence." *See* p. 17. MyMail cannot escape the intrinsic record by stating that the parts they do not like are not relevant. MyMail believed those prior constructions were relevant as of their submission to the Patent Office. MyMail cannot claim now that they are irrelevant purely because they are inconvenient to MyMail in its new lawsuit.

## II.   LEGAL PRINCIPLES

### A.  *MyMail's Legal Principles*

Claim terms receive "the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention." *Phillips v. AWH*, 415 F.3d 1303, 1312–1317 (Fed. Cir. 2005). Courts "indulge a heavy presumption that claim terms carry their full ordinary and customary meaning unless the patentee unequivocally imparted a novel meaning to those terms or expressly relinquished claim scope during prosecution." *Omega Eng'g v. Raytek*, 334 F.3d 1314, 1323 (Fed. Cir. 2003). The specification and prosecution history could compel departure from the

plain meaning in only two instances: lexicography and disclaimer/disavowal. *Thorner v. Sony Computer Entm't Am.*, 669 F.3d 1362, 1365 (Fed. Cir. 2012); *Hill-Rom Servs. v. Stryker*, 755 F.3d 1367, 1371 (Fed. Cir. 2014). The patentee is free to be his own lexicographer, but any special definition given to a word must be clearly set forth in the specification, and such lexicography must be "clear and explicit." *Martek Biosciences v. Nutri-nova*, 579 F.3d 1363, 1380 (Fed. Cir. 2009); *Intellicall v. Phonometrics*, 952 F.2d 1384, 1388 (Fed. Cir. 1992). Where the specification and claims describe different components, a court should make that same distinction in its construction. *See*, *e.g.*, *Apple v. Motorola*, 757 F.3d 1286, 1305 (Fed. Cir. 2014); *Becton, Dickinson v. Tyco Healthcare Group*, 616 F.3d 1249, 2154 (Fed. Cir. 2010); *Merck v. Teva Pharms.*, 395 F.3d 1364, 1372 (Fed. Cir. 2005) ("A claim construction that gives meaning to all the terms of the claim is preferred."); *Pause Tech. v. TiVo*, 419 F.3d 1326, 1334 (Fed. Cir. 2005) ("[W]e must give each claim term the respect that it is due."); *Exxon Chem. Patents v. Lubrizol*, 64 F.3d 1553, 1557 (Fed. Cir. 1995) ("We must give meaning to all the words."). Although the specification is relevant to interpreting the meaning of disputed claim language, particular embodiments and examples appearing in the specification will not generally be read into the claims. *Hill-Rom*, 755 F.3d at 1371. Even when the specification describes only a single embodiment, the claims of the patent will not be read restrictively unless the patentee has demonstrated a clear intention to limit the claim scope using "words or expressions of manifest exclusion or restriction." *Id.*; *Liebel–Flarsheim v. Medrad*, 358 F.3d 898, 906 (Fed. Cir. 2004).

In cases where claim construction issues are related, such as in different cases involving the same patent or different cases involving related patents, the same claim terms are generally construed the same based on principles of collateral estoppel. *Yodlee*, 2016 WL 204372 at *3-4. However, the Federal Circuit has noted "that a district court's claim construction decision is not

necessarily binding on future courts." *Id.* (citing *e.Digital Corp. v. Futurewei Technologies, Inc.*, 772 F.3d 723, 726 (Fed. Cir. 2014)). Courts, including this Court, will look to the principles of collateral estoppel (or "issue preclusion") in determining whether to apply a prior court's claim construction determination or initiate its own determination. *Id.Id.* While issues of patent law are generally governed by Federal Circuit law, the Federal Circuit applies regional circuit law to procedural questions such as issue preclusion – *i.e.*, regional circuit law governs the estoppel effect of prior decisions. *See Bayer AG v. Biovail Corp.*, 279 F.3d 1340, 1345 (Fed. Cir. 2002). "In the Third Circuit, collateral estoppel applies where: '(1) the issue sought to be precluded is the same as that involved in the prior action; (2) that issue was actually litigated; (3) it was determined by a final and valid judgment; and (4) the determination was essential to the prior judgment.'" *Yodlee*, 2016 WL 204372 at *3-4 (*quoting Burlington N. R.R. v. Hyundai Merch. Marine Co.*, 63 F.3d 1227, 1231-32 (3d Cir. 1995) (internal quotation marks omitted)). These factors, which inherently require flexibility, should be applied by courts on a case-by-case basis when determining whether a party is precluded from re-litigating a prior claim construction determination. *See RF Delaware, Inc. v. Pacific Keystone Technologies, Inc.*, 326 F.3d 1255, 1260-62 (Fed. Cir. 2003). Indeed, the Federal Circuit has recognized the application of collateral estoppel is discretionary, allowing a trial court to take into account the diverse circumstances that cases involving the same or related patents can present. *A.B. Dick*, 713 F.2d at 702; *see Yodlee*, 2016 WL 204372 at *3-4 (finding claim construction order was "not a 'final judgment' for collateral estoppel purposes" but also observing "the preclusive effect of a prior District Court's claim construction ruling depends on the specific facts of the case"). Thus, "it is unclear whether judicial estoppel would apply" in any case unless, and until, a full analysis of the facts of both cases is performed under the factors noted above. *See Forest Labs., Inc. v. Teva Pharm. USA Inc.*, No. CV 14-121-LPS, 2016 WL 3606177, *2 (D. Del.

May 25, 2016); *Yodlee*, 2016 WL 204372 at \*4. The party seeking to invoke collateral estoppel bears the burden of showing the four elements are present. *Oracle Corp. v. Parallel Networks, LLP*, 588 F. Supp. 2d 549, 567 (D. Del. 2008), *vacated sub nom. Oracle Corp. v. Parallel Networks, LLC*, 375 Fed. Appx. 36 (Fed. Cir. 2010) (*quoting Novartis Pharmaceuticals Corp. v. Abbott Laboratories*, 375 F.3d 1328, 1333 (Fed.Cir.2004) (*quoting Hawksbill Sea Turtle v. FEMA*, 126 F.3d 461, 475 (3d Cir.1997))); *Dici v. Pennsylvania*, 91 F.3d 542, 548 (3d Cir.1996).

## III.    DISPUTED CLAIM TERMS

### A. *Term - "network service provider" or "NSP"; and "access provider"*

**"network service provider" constructions:**

| '290 Claim Construction Order | NETGEAR's Construction | MyMail's Construction |
|---|---|---|
| a party that provides a connection to the network and authenticates users for access to the network | a party that provides a connection to the network and authenticates users for access to the network | Hardware and/or software that provides a connection to a network. |

**"access provider" constructions:**

| '290 Claim Construction Order | NETGEAR's Construction | MyMail's Construction |
|---|---|---|
| a party that provides authenticated access information to a user through the network to enable the user to access one or more NSPs<br><br>(This is the construction of the synonymous terms "access service", "access service provider", "access SP", and "ASP") | a party that provides authenticated access information to a user through the network to enable the user to access one or more NSPs | Hardware and/or software that provides network access information. |

### 1.  *MyMail's Opening Position*

The proper construction of "network service provider" or "NSP" is "hardware and/or software that provides a connection to a network." The proper construction of "access provider"

is "hardware and/or software that provides network access information.[8] As noted in the '318 specification, an NSP provides users with a connection to the network. *See, e.g.*, Ex. 1 at 6:5-15 & Claim 5. Further, a provider of access provides users with the information to access the network. *See, e.g.*, *id.* at 7:28-30 & 7:48-56.

In support of its constructions, Netgear relies heavily upon the constructions from the *AOL* case. However, as a threshold matter, the term "access provider" was not construed in the *AOL* case. Moreover, as for the NSP term appearing in both the '290 and '318 patents, the principles of collateral estoppel do not apply. Thus, Netgear's reliance on the *AOL* case is entirely misplaced, and this Court should construe NSP as proposed by MyMail. Where multiple patents derive from the same parent application and share many common terms, courts interpret the claims consistently across those patents. *Sherwin-Williams Co. v. PPG Indus., Inc.*, No. CV 17-01023, 2018 WL 3845239, *3–4 (W.D. Pa. Aug. 13, 2018) (*quoting SightSound Techs., LLC v. Apple Inc.*, 809 F.3d 1307, 1316 (Fed. Cir. 2015)). However, this consistency does not require the exact same construction be applied in every case. Rather, a court's construction of a previously construed term need only be consistent, not the same. Here, MyMail's proposed construction of NSP is entirely consistent with the construction in the *AOL* case. At a minimum, MyMail requests this Court further construe this term in view of the further dispute between MyMail and Netgear as to what a "party" in the *AOL* case construction entails, and whether that comprises hardware and/or software.

Further, including in view of this additional dispute and entirely different claims between the '290 and '318 patents, and considering each of the four factors for application of collateral estoppel, the principles of collateral estoppel do not favor this Court simply adopting the *AOL* case

---

[8] The parties agree an NSP provides a connection to a network and an "access provider" provides "access information" for a network.

construction. As to factor 1, the issues here are not the same as those in the *AOL* case. The instant claims are in a different patent than the patent at issue in the *AOL* case, including, as MyMail conceded previously, the '318 patent includes unclaimed inventions from the '290 patent. Further, the '318 instant patent was prosecuted, and issued, after the '290 patent. Thus, while the "additional prosecution history, before the court in the instant case[], does not necessarily mean that the scope of any disputed limitations changed…, the court cannot simply ignore new prosecution history that was not of record in the [*AOL*] litigation." *Golden Bridge Tech., Inc. v. Apple Inc.*, 937 F. Supp. 2d 490, 496–97 (D. Del. 2013) (*citing Power Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc.*, Civ. No. 08–309, 2009 WL 4928029, *16-17 & n. 1 (D. Del. Dec. 19, 2009) (*citing FEMA*, 126 F.3d at 477) (finding collateral estoppel does not apply where subsequent "reexamination history needs to be considered in connection with construing the claims")). As to factor 2, it is undisputed that the term NSP was construed in the *AOL* case. However, under the facts of the *AOL* case, the current dispute as to whether a "party" comprises hardware and/or software, was not litigated, or even suggested, because that issue was not part of that case. As to factors 3 and 4, while the *AOL* case was terminated by a grant of summary judgment of non-infringement following claim construction, the specific issues here were not those essential to the finality of the prior judgment. This current dispute was not settled, or even discussed, in the *AOL* case. In fact, the reason summary judgment was granted, and affirmed on appeal, was entirely related to MyMail's infringement theory in the *AOL* case, alleging Earthlink's third-party modem devices authenticated users. Nor, as noted, was there any issue regarding whether a "party" comprises hardware and/or software underlying the summary judgment. If anything, MyMail's infringement theories entirely support, and directly align with, its current proposed construction for NSP as hardware and/or software (*e.g.*, modem devices or other networking devices).

Further, the '318 claims have a different scope of than those of the '290 patent, and the '290 terms were construed in the context of those claims and a dispute over those claims. Certainly, no construction inconsistent with the '318 claim language would be proper under any circumstances. Additionally, even if this Court considers the application of issue preclusion (which it should not), "the Court must consider the fairness of the application of issue preclusion to both Parties under principles of equity." *JumpSport v. Academy*, 2018 WL 4090471, *9 (E.D. Tex. Aug. 28, 2018) (*citing Nations v. Sun Oil Co. (Delaware)*, 705 F.2d 742, 744 (5th Cir. 1983)). "Issue preclusion is intended as a defense to protect litigants from unnecessarily relitigating issues that have already been decided by a court." *Id.* (*citing Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 326, 99 S. Ct. 645, 649, 58 L.Ed. 2d 552 (1979) (*citing Blonder-Tongue Laboratories, Inc. v. University of Illinois Foundation*, 402 U.S. 313, 328–329, 91 S. Ct. 1434, 1442–1443, 28 L.Ed. 2d 788 (1971))); *Jean Alexander Cosmetics, Inc. v. L'Oreal USA, Inc.*, 458 F.3d 244, 253 (3d Cir. 2006) ("Collateral estoppel…has the dual purpose of protecting litigants from the burden of relitigating an identical issue with the same party or his privy and of promoting judicial economy by preventing needless litigation.") (*quoting Parklane Hosiery*, 439 U.S. at 326)

As noted, the current disputed scope of the claim was not material in the *AOL* case decision, nor have it "already been decided by a court." Further, the constructions and rulings in the *AOL* case did not consider an embodiment that is claimed by the '318 claims, but which MyMail conceded during the *AOL* case was unclaimed by the '290 claims. Neither this Court, nor MyMail, should be bound by the '290 constructions from the *AOL* case. Rather, this Court should apply the correct constructions in the context of the '318 claims, particularly asserted claim 5.

The starting point for the proper construction of these terms is asserted '318 claim 5, which recites a method that is performed with hardware and/or software. Neither claim 5, nor anything

else in the '318 patent, the prosecution history, or any other relevant evidence, states that the NSP or access provider must be a different corporate entity or different system. Claim 5 only requires that the "access provider" be connected to the same network as the NSP. Non-asserted independent claim 1 requires an "access service" instead of an "access provider," and it does not require an NSP. Under the doctrine of claim differentiation, the use of the term "access service" in claim 1 and the term "access provider" in claim 5 supports that these terms are not the same and have a different scope. The same holds true for the use of the terms "access SP," "access service provider," "access service," and "ASP" in the '290 claims, as opposed to "access provider" being the term used in '318 claim 5. Non-asserted independent '318 claim 3 does not require an "access provider" either. Rather, the NSP has an access service databank, and, in claim 3, the NSP systems (*i.e.*, hardware and/or software) are clearly performing the function of providing access information. The proper understanding of "Internet service provider access service" is, by its plain meaning, an ISP (which can be an NSP) acting as the access provider. Ex. 1 at 7:28-30.

      a. <u>Party vs. Hardware/Software</u>

Even if this Court was inclined to follow the '290 constructions from the *AOL* case advocated by Netgear, which it should not – including in view of fairness and consistency, then MyMail and Netgear clearly dispute whether the term "party" includes or excludes hardware and/or software. None of the prior decisions associated with the '290 patent, including the *AOL Markman*, *AOL* summary judgment ruling, and *AOL* appeal specifically addressed what constituted a "party."

The Federal Circuit has held that "[w]hen the parties raise an actual dispute regarding the proper scope of [claim terms], the court, not the jury, must resolve that dispute." *O2 Micro*, 521 F.3d at 1362-63. Subsequent cases have confirmed that it is legal error for a district court to allow the jury to decide questions of claim scope. *See Eon Corp. IP Holdings LLC v. Silver Spring*

*Networks, Inc.*, 815 F.3d 1314, 1318 (Fed. Cir. 2016). At a minimum, pursuant to *O2 Micro*, and its progeny, that dispute should be resolved. Whether the court properly construes "party" to include hardware and/or software in the context of the '318 specification and claims, or whether it clarifies the situation by using the words "hardware and/or software" in its constructions, the end result is the same and *O2 Micro* is satisfied.

MyMail's proposed construction for "network service provider" as "hardware and/or software" avoids the ambiguity associated with the term "party" in Netgear's proposed construction and in the *AOL* case construction. Netgear contends, without support, that the "party" limitation means that one company or one system cannot perform both the NSP and access service provider functions. However, a reference to a "party" includes a reference to hardware and/or software. For example, two modems, network devices, or computers can be the "parties" to a communications transaction, or two computers can be the "parties" to a financial transaction. Further, a party cannot perform the claimed method without hardware and/or software (*e.g.*, due to technical claim terms such as modifying a stored set of network access information," "downloaded," and "re-accessing the network.) Certainly, in the context of the '318 patent, a reference to a "party" includes a reference to hardware and/or software. For example, a "service system" is referred to as a "third party mail relay," '318/3:17-20, and software would be used to perform a "third party mail relay process." '318/3:40-42. Furthermore, embodiments recited in the '318 patent, describe that the network service and network access functions are performed by systems comprising servers and databases – *i.e.*, hardware and/or software. *See, e.g.*, Fig. 1 & references to ISP 102a, etc. & access service provider 106.

As to whether equipment can constitute an NSP or access provider, the specification describes that an NSP can comprise hardware and/or software. *See, e.g.*, Fig. 1, including ISPs

102a, 102b, etc., and ASP 106; Fig. 2, including ASP 106 and network server/DBs 220; Figs. 19-21 including NAPs 1122, 1152 and 1182 and NAP authentication servers 1154, 1184. For example, the specification states that invention "includes software." '318/61-67. Further, it notes that the invention "relates to network connections," it "applies to any network," such as the Internet, it "supports many types of physical connections such as telephone dial-up connections, ISDN connections, Ethernet, and other local area networking connections," and it "allows systems to be independently, transparently and dynamically [] reconnected to a network." Ex. 1 at 4:54-55 & 5:32-34. Further, in some embodiments, authentication is performed by an authentication server or by a database. *Id*. at 7:3-8, 23:48-62, 27:30-34, & Fig. 2 (access service provider 106 comprising network server/DB 220). A construction of NSP or "access provider" that excludes hardware or software performing those functions would be contrary to reality, and contrary to the teachings of the '318 specification and claims. Further, authentication can be performed by the "authentication portion" of a server such as server 1154 in Fig. 20. *Id*. at 27:53-56 & Fig. 20. This disclosure is consistent with the common sense notion that a single system can have physical or logical portions that perform different functions.

b.  <u>Whether the NSP must authenticate users for access to the network.</u>

Asserted claim 5 is directed to a "method of obtaining a set of network access information." It is irrelevant whether the NSP authenticates a user. "Claim 5 has only two requirements involving the NSP, 1) "re-accessing the network via a given network service provider (NSP)" and 2) "using the modified set of network access information" for the re-access. There is no language in claim 5 to even suggest that the NSP must perform authentication.

To the extent this Court deems itself, or MyMail, to be bound by the construction of NSP in the *AOL* case (which would be erroneous, as noted above), it should be noted (as discussed above) that the construction would have been different had MyMail not conceded that an

embodiment in the specification was not covered by the claims of the '290 patent. No such concession has been made with respect to the '318 claims especially asserted claim 5. In the relevant embodiment, "access service" performs authentication for one or more NSPs. *Id.* at 23:42-61. In this embodiment, the "authentication server" of an NSP provides the access information for that NSP and other NSPs. *Id.* at 23:52-61. Moreover, as noted, this embodiment was not at issue in the *AOL* case because MyMail had conceded it was not claimed by the '290 claims. Indeed, the claims of the of the '290 patent have significant differences with those of the '318 patent, including as noted above in § I.B. Without limitation, independent '290 claim 1 involves the user initially communicating an "access SP (ASP)" via an available NSP. Further, Independent '290 claim 3 comprises establishing a first telecommunications link between the user and ASP, and the user connecting to an NSP via a second telecommunications link. Further, independent '290 claim 13 is directed to a method wherein the ASP is on a network with an initialization NSP, and the initialization NSP is different from an NSP that is accessed using the customized set of identification information. Here, the method of '318 claim 5 only requires re-accessing the network via the NSP. Claim 5 is agnostic to whether the NSP, the access provider, or another system provides the authentication. The authentication requirement of the NSP from the *AOL* case was a function of certain '290 claims, which are materially different from the '318 claims, including in this respect.

2. *NETGEAR's Answering Position*

NETGEAR takes its constructions for these two terms directly from the '290 Patent litigation claim construction order. Ex. 12 at 21. A "network service provider" and an "access provider" are each "parties", the network service provider "authenticates users", and the access provider sends access information to the user "through the network". These constructions are supported by the claims themselves, the specification, and certainly the prosecution history—

which includes the claim construction order defining the terms. The term "network service provider" is used the same way in both patents—both show the network service provider being used to access the network using a modified set of information or data.[9] And while the specific words "access provider" were not previously construed, the synonymous terms "access service", "access service provider", "access SP" and "ASP" were construed—and not surprisingly they all mean the same thing.

MyMail, in contrast, 1) reads the concept of a "party" clean out of the terms, replacing it with the virtually meaningless "hardware and/or software", 2) removes the requirement that the network service provider "authenticates users for access to the network", even though that is precisely what it does, and 3) eliminates the requirement that the access provider provide access information "through the network", when, again, that is precisely what it does.

> a. A "network service provider" and an "access provider" are "parties", not simply "hardware and/or software."

The "party" concept is found on the face of the '290 and '318 Patents, which declare that the very purpose of the invention is that it "divides the responsibility of servicing a given user wanting to access the network between multiple *parties*…" Ex. 1 at abstract (emphasis added). This same phrasing is repeated in the patentee's "Summary of the Invention." *Id*. at 3:48-50 (emphasis added). And this concept is reflected in the claims: a connected user downloads information from a first party—the access provider—to then reconnect to the network via a second party—the network service provider. This separate party concept is fundamental to the disclosed purpose of the patent.

---

[9] *Compare* Ex. 3, '290 Patent at claim 11 ("using said modified set of log-in data when next accessing the network via a given NSP") and claim 13 ("re-establishing communication with the network through said selected NSP using the customized set of identification information") *with* Ex. 1, '318 Patent at claim 5 ("re-accessing the network via a given network service provider (NSP) using the modified set of network access information").

MyMail's arguments from the '290 litigation explain that the NSP and ASP are parties. In describing the nature of the invention as a multi-party method, MyMail titled a section of their reply claim construction brief as "The Parties: An ASP, an NSP, and a User." Ex. 13, Pl.'s '290 *Markman* Reply Claim Construction Brief, at 2. MyMail described both the NSP and ASP as parties throughout its briefing.[10] The term fits, is clear, and was used by MyMail on the face of the patents and in its own claim construction. No need to change it now.

The district court found "party" clear, construing both ASP and NSP as a "party." *Mymail, LTD. v. Am. Online,* 2005 U.S. Dist. LEXIS 40716, at *11. Nor did the Federal Circuit have problems with the term "party", discussing the NSP as the "identity of the **entity** performing authentication" and explaining that "[t]o generalize the invention, the claims use the term Network Service Provider or NSP to **refer to a _party_ in a generic network** performing the function of an ISP and providing modem services to network users." *MyMail, Ltd. v. Am. Online, Inc.*, 476 F.3d at 1374 (emphasis added). Both courts understood what a "party" is.

While MyMail now says it proposes to further construe "party" (p. 31), in reality it simply seeks to replace that term with "hardware and/or software." In proposing that switch MyMail's argument contains a key logical fallacy: MyMail argues that "an NSP/ASP *can comprise* hardware and/or software" (p. 32 (emphasis added)), but then makes the fallacious leap that if it has hardware and/or software, then it is an ASP/NSP. That is like saying that because a dog has four legs, if it has four legs it's a dog—so by the way your cat infringes my patent.

Even the examples MyMail uses reinforce the entity notion of a party: financial transactions between two parties, communications transactions between parties, and use of "third

---

[10] *See, e.g., id.* ("an NAP is an NSP: a party that provides an actual connection to the network through a physical interface."); *id.* at 11 ("an ASP offers network access over a connection provided by another party, and the party that provides the actual network connection hardware is an NSP").

party" relay systems. MyMail Br. at 16. These entities may have hardware or software, but that is not what makes them parties.

      b.   The NSP "authenticates users for access to the network."

The authentication requirement comes directly from claim 5 itself, which requires "re-accessing the network *via a given network service provider (NSP) using the modified set of network access information.*" Ex. 1 at claim 5 (emphasis added). The specification also discusses the authentication requirement, stating that a defining attribute of an ISP (the internet-specific equivalent of an NSP[11]) is that it manages customer accounts by *authenticating* users.[12] The specification goes on to discuss the methods that the ISP might use to perform the authentication process.[13]

The Federal Circuit expressly affirmed the authentication requirement: "we interpret the specification as requiring the NSP to perform the authentication function." *MyMail, Ltd. v. Am. Online, Inc.*, 476 F.3d at 1376 (construing NSP based on an analysis of the specification). The Federal Circuit bolstered its holding based on an admission by MyMail's counsel, stating that during the *Markman* hearing, "counsel acknowledged that under the patent the 'NSP has to do [authentication]'." *Id.* at 1377.

MyMail argues that this case differs from the '290 litigation because that case involved an "unclaimed embodiment." *See* pp. 4, 33. The '290 and '318 Patents include an embodiment which MyMail argues has the access service provider performing the authentication, rather than the NSP.

---

[11] *Id.* at 5:39-43.

[12] *Id.* at 6:67-7:3 ("Upon receipt of the access information, the ISP '*authenticates*' the user 110. The ISP checks to see whether the PAP ID and PAP password received from the user 110 is valid") (emphasis added).

[13] *Id.* at 7:3-7:6 ("It will be understood that the authentication process performed by the ISP 102 utilizes one or more appropriate methods (such as Remote Authentication Dial-in User Services (RADIUS)) ….").

*See* p. 33.  In the '290 litigation, MyMail conceded that this was an "unclaimed embodiment," and the Federal Circuit pointed to that concession in affirming the requirement that an NSP "authenticates users." *MyMail, Ltd. v. Am. Online, Inc.*, 476 F.3d at 1377-78..

But that embodiment remains unclaimed. The NSP still functions the same in claim 5 as it did in '290 Patent claims 11 and 13—claims that MyMail conceded do not capture that "unclaimed embodiment." Claim 11 requires "using said modified set of log-in data when next accessing the network via a given NSP" and claim 13 requires "re-establishing communication with the network through said selected NSP using the customized set of identification information". These limitations are consistent with claim 5's "re-accessing the network via a given network service provider (NSP) using the modified set of network access information." As discussed previously, the asserted claim 5 is nearly identical to the claim 11 of the '290 Patent, and the Patent Office rejected claim 5 for double patenting over claims 11 and 13 of the '290 Patent. *See supra* Section I.B.3. The Parent '290 Patent.

c.  An "access provider" is the same as an "access service provider"—and an "access service" and an "access SP" and an "ASP"—which were all previously construed the same way.

The specification is rather loose with what it calls an Access Service Provider. It variously uses the terms ASP, access service provider, access SP, and access service. Ex. 12 at 21. The prior court and the parties recognized the obvious—they all mean the same thing. And now, "access provider" joins that list as well.

MyMail now argues "claim differentiation". *See* p. 31.  So the other four terms meant the same thing, but this fifth one does not? Nothing from the claims or specification supports that argument.

MyMail itself equated access provider with the previously-construed access service. During prosecution, MyMail specifically pointed to the specification's access service discussion

as support for access provider. Ex. 5 at MYM002820-2824 (describing the access service as providing the "log-in information" for the "Desired ISP"–which is the same role that the access provider fills in the asserted claim); *id.* at MYM002844-2845. In describing the support for issued claim 5, which only recites an ***access provider***, MyMail states "The ***access service*** provides the user with network access information for the Desired ISP", citing to what in the issued patent specification is the '318 Patent at 7:53-8:3. *Id.* at MYM002863. And *that* specification in turn describes the access service 106. These citations were no mistake, as these portions of the specification describe the access service as performing the same functions that the access provider performs in asserted claim 5.

The history of claim 5 also shows that access provider is the same as the four previously-construed access service provider synonyms. Claim 5 actually began its life as *part* of the '290 Patent's application as claim 12. Ex. 14, '290 Patent file history at MYMAIL 001278. MyMail amended that claim during the '290 Patent prosecution (*id.* at MYMAIL 001481-1511):

> 12.    (AMENDED)  A method of obtaining a set of network access data comprising the steps of:
>       modifying stored network access data using new data downloaded from an access provider connected to said network; and
>       reaccessing the network via given network service provider (NSP) using the modified network access data.

*Id.* at MYMAIL001508. The claim as amended included the current "access provider" term. MyMail argued this amendment "more particularly recite[ed] one of the distinguishing characteristics of the present invention…, namely, the steps of initially communicating with the ***access SP*** via an available NSP and storing information supplied by said ***access service*** for accessing said given NSP." *Id.* at MYMAIL001488 (emphasis added). So for what ultimately became the very claim asserted in this case, MyMail itself equated "access provider" not only to

"access service" but also to "access SP". The term "access provider" has always meant the same thing as "access service", in both the '290 Patent and the '318 Patent.

And while MyMail then suggests an "Internet service provider access service" is an ISP acting as an access provider (*see* pp. 31, 2), MyMail misreads the patent. Under a proper reading, the full phrase shows that "Internet service provider access service" is one and the same as an "ASP" (and an access service, and access SP, etc.). MyMail begins with a clear mis-citation to suggest these were two different elements, stating that in certain embodiments an "[ISP] access service or access service provider (ASP)" is connected to the network. *See* p. 2.  That is a both inaccurate and incomplete quote. The actual quote, discussing Figure 1, reads: "In accordance with the present invention, ***an Internet service provider access service or ASP (Access Service Provider) 106*** is connected to the Internet". Ex. 1 at 7:28-30 (emphasis added). But Figure 1 has a single element 106 that the full phrase describes—and has *separate* elements 102 that are ISPs. So when MyMail then concludes "'[ISP] access service' is, by its plain meaning, an ISP providing an access service," it has it backwards—it is a *service* (box 106) for providing *access to* the ISPs (boxes 102). Or in other words, it is an ASP, which is in fact an access service for selecting which Internet service provider will be used. They are one and the same.

    d.   The access provider provides the access information "through the network".

The "through the network" limitation is found in the language of the asserted claim itself, which describes "using new information downloaded, **via the network**, … from an access provider connected to said network" (emphasis added). Figures 1 and 2 illustrate this requirement, as the access provider is connected to the network, but provides access information over/through the network to a network service provider, and then on to the user's device. The access information is provided through the network, and the court in the '290 litigation cited this as the basis for its construction containing this requirement. Ex. 12 at 5-6. Because MyMail's proposed construction

of the term lacks this requirement, it is inconsistent with both the claim language, the specification, and the prior construction.

      e.   <u>The prior construction of NSP/ASP is an evidence issue, not just a collateral estoppel issue.</u>

The '290 claim construction order is intrinsic evidence that MyMail submitted to the Patent Office in the prosecution of the '318 Patent. It effectively defines the meaning of the NSP/ASP terms. It's a guidepost which informs the meaning of the '318 Patent claims.

The prior claim constructions are fatal to MyMail's current infringement case. But rather than acknowledging the impact of those constructions found in the intrinsic evidence, MyMail seeks to make this an issue of collateral estoppel. But whether and to what extent collateral estoppel applies is a distraction given the constructions and definitions are intrinsic evidence—and indeed, attached to a Patent Office appeal brief as an exhibit.

To be clear, collateral estoppel does apply under MyMail's own legal standard. *See* p. 25, *citing Yodlee*, *Inc. v. Plaid Techs., Inc.*, C.A. No. 14-1445-LPS, 2016 WL 204372 at *3-4 (D. Del. Jan. 15, 2016) (quoting standard from *Burlington N. R.R.*, 63 F.3d at 1231-32 (3d Cir. 1995). The issues are the same—same construed terms on the same specification. Those terms were fully litigated. The result was a final judgment against MyMail, both at district court and on appeal to Federal Circuit. And the construed terms were essential to the judgment—while the ultimate issue was where authentication occurred (the NSP or the ASP), that issue was meaningless without the foundation of what NSP, ASP, network access information, and the associated network actually are. But while MyMail should be estopped, the constructions hold whether it is or is not.

Finally, MyMail suggests it should be able to rewrite these constructions from whole cloth because its infringement theories have changed. *See* p. 29. No argument on the latter point— MyMail seeks to stretch its patent far beyond its claims and its disclosure. But the claim terms

across these patents mean what they mean, [14] and changing theories are not a license to change those meanings.

### 3. *MyMail's Reply Position*

Many of these issues are already addressed in MyMail's Op.Br. and above. Defendant's argument "access provider" is just a variant of ASP ignores that "access provider" is broader, including encompassing an "internet service provider access service" (*i.e.*, an ISP (or NSP) acting as the access provider), as noted in the specification ('318/7:28-30 & 23:52-61), and ignores the doctrine of claim differentiation, including wherein "access provider" is used in '318 claim 5 versus "access service" in claim 1. *Kara Tech. v. Stamps.com*, 582 F.3d 1341 (Fed. Cir. 2009). Further, the original specification referred to an "Internet service provider access service," but the patentee amended to add "*or* ASP (Access Service Provider)." Resp.Br., Ex. 14 at MYM017477 & 17487. Different terms were used disjunctively for different apparatuses providing access information. Defendant's allegation the embodiment where an ASP or access provider can authenticate is an "unclaimed embodiment" for the '318 claims is erroneous. As noted above, solely for the noted '290 claims, the ASP could not authenticate since it was on a different network than the second NSP. That is inapplicable to the '318 claims, including claim 5, which, as noted above, does not include, and is agnostic with respect to, the hardware/software performing the authentication. Further, the access provider and NSP are necessarily on the same network as claimed. Defendant's attempt to limit the "Internet service provider access service" to an embodiment involving a "Single-dial Multi-Login sub-function" is unavailing. The specification

---

[14] *See, e.g.*, *Epcon Gas Sys. Inc. v. Bauer Compressors, Inc.*, 279 F.3d 1022, 1030-31 (Fed. Cir. 2002) ("the same term or phrase should be interpreted consistently where it appears in claims of common ancestry"); *AbTox, Inc. v. Exitron Corp.*, 131 F.3d 1009, 1010 (Fed. Cir. 1997) ("it would be improper to construe [a] term differently in one patent than another, given their common ancestry."); *Omega Eng'g*, 334 F.3d at 1334 ("[W]e presume, unless otherwise compelled, that the same claim term in the same patent or related patents carries the same construed meaning.").

does not limit this configuration to performing this subfunction. Further, even if so limited, which it is not, Defendant has no argument this subfunction is excluded under the '318 claims, including since claim 5 covers a situation where there is only a single connection but multiple log-ins. Similarly, Defendant's argument the invention is solely directed to a single user serviced by multiple parties ignores the above-noted embodiments. *Adams Respiratory Therapeutics v. Perrigo*, 616 F.3d 1283, 1290 (Fed. Cir. 2010) (Constructions excluding preferred embodiments are "rarely, if ever, correct."). Defendant's references to a "present invention" are selective and directed to general statements, and functionality "in accordance with the present invention" does not limit the claimed invention, nor has Defendant shown such. *See, e.g., SciMed v. Advanced Cardio.*, 242 F.3d 1337, 1343 (Fed. Cir. 2001); *Vectura Ltd. v. GlaxoSmithKline LLC*, 2018 WL 4700222, *4 (D. Del. Oct. 1, 2018). Defendant also fails to consider other embodiments, including as claimed.

Defendant objects to citing specification support for ASPs in connection with the "access provider" term. However, as noted, an "access provider" is broader than ASP, including because it includes an ISP (or NSP) or other "centrally located database point" providing access information, and, thus, citations to functions performed by ASPs are relevant, but not restrictive, for what constitutes an "access provider" as claimed and described. *See* '318/23:52-61. Just because an ASP provides access information does not mean an access provider cannot also provide it, including as noted in the specification. Further, in citing to the prosecution history, Defendant improperly attempts to bootstrap its estoppel argument into the prosecution history which, as noted, did not apply the *AOL* case constructions Defendant improperly seek to impose on '318 claims. Defendant's citation to an example noting an ISP performing authentication misses the point this is just *one embodiment, not a definition*. *See Martek*, 579 F.3d at 1380 (lexicography must be "clear

and explicit."). It also misses the point an ISP need only provide *Internet* access to be an ISP, and an NSP, coined as similar to an ISP, but not limited to the Internet, need only provide *network* access. *See, e.g.*, '318/1:55-56, 5:39-44, & 23:48-55. The defining trait of an ISP (or NSP) is *providing network access* (*i.e.*, service), not authentication, which can be delegated. Further, there is no requirement in the '318 claims or specification the access information be pre-authenticated as Defendant suggests. For example, claim 5 only requires modification of stored access information result in modified access information used for access. Yet both sets of information are access information. Further, access information is broader than authentication information, and, for example, could be an access phone number. '318/6:35-51.

a. Party vs. Hardware/Software

Defendant argues an inventor, Mr. Selgas, stated in the *AOL* case that an ASP is a "business." However, Mr. Selgas was speaking about '290 infringement theories directed to the companies defending that case, not claim construction positions. Further, Mr. Selgas has given testimony more specific to present issues which favors MyMail's proposed construction of "hardware/software" in the '318 context. Ex. 15 at 152:17-22, 155:24-156:7, & 270:17-271:13. To the extent inventor testimony is relevant to claim construction, it favors MyMail's constructions. *See Howmedica Osteonics v. Wright Medical*, 540 F.3d 1337, 1346-47 (Fed. Cir. 2008). Defendant's references to MyMail accusing the *AOL* case defendants of being ASPs or NSPs is indistinguishable from referring to their equipment as performing the functions of ASPs and NSPs. Defendant's allegation MyMail's Op.Br. lacked support for NSPs and access providers being hardware and/or software is mistaken. *See* Op.Br. at 22. Also, the '318 specification notes the accessing, connecting, and disconnecting involving ASPs and ISPs. See '318 *passim*, incl. at Figs 1 & 2, 2:16-20, 2:28-31, 6:5-15, 6:25-27, 7:9-11, 7:23-24, 7:28-33, 8:8-15, 9:3-6, 11:23-30, & 12:5-8. Hardware running software, not companies, connects/disconnects in the context of

communications networks, including the '318 patent context. Further, ASP 106 is referred to in places as "server 106." 12:15-17. Further, the Federal Circuit's opinion in the *AOL* appeal likens "party" to an "**entity**" multiple times. *AOL* appeal, 476 F.3d at 1373-79. To the extent this decision on the '290 patent is informative here, it equates NSPs and access providers with "entities," which refers to hardware/software, where both patents use the term "**entity**" to refer to software and hardware, including a "browser," "monitoring" software, and "pinger." '318/2:40-44, 3:4-9, 10:17-32 & 25:9-12. For example, the specification notes the "pinger entity may be a part of the access service provider" and the pinger is "initiated by the client dispatch application 200." '318/11:38-40 & 12:14-17. The word "provider" does not imply an entity, including because hardware/software provides the described functionality. Further, ASPs and access providers include a "computer system having one or more processors, memory, and support hardware…" '318/11:23-30. Consistent with other claims comprising physical connections, and the like, claim 5 comprises an access provider "connected to" the network.

Defendant's suggestion of separate parties, *i.e.*, separate corporate entities, being separately involves being "fundamental" to the '318 patent ignores the clear claim language, which does not require such distinction, and improperly selectively reads from the specification. For example, as already noted, NSPs and access providers function with hardware/software, and are even referred to in those terms, and there are disclosed embodiments with a single NSP and something other than that NSP authenticating. Further, this distinction was not present in the '318 prosecution history, either in prior art meeting limitations or in arguments against such limitations being met.

    4. *NETGEAR's Sur-Reply Position*

       a.   The NSP "authenticates users for access to the network."

MyMail attempts to remove the authentication requirement from the NSP. There is no support for this removal and MyMail's arguments fail for four reasons.

First, MyMail argues that NETGEAR "ignores the substantial '318 prosecution history noted in the Op.Br., showing no requirement the NSP be the authenticator." *See* p. 18. But this is flatly incorrect—the prior constructions are in the file history, and these prior constructions expressly include the requirement that the NSP "authenticates users". Ex. 5, '318 Patent file history at MYM002876. And those constructions reflect an analysis of the actual patent specification, which both the district court and the Federal Circuit determined required the NSP to perform authentication.

Second, MyMail attempts to distinguish the claims in the '290 Patent from asserted claim 5 of the '318 Patent by arguing that the NSP in the '290 litigation claims performs authentication (and that the access provider does not).[15] In particular, MyMail argues that the claims in the '290 Patent require two separate networks, while claim 5 of the '318 Patent operates with only a single network. *See* p. 42. This is incorrect. At least '290 Patent claims 11 and 13 require only one common network—just like the presently asserted claim 5. And, as explained in NETGEAR's Answering Claim Construction Brief, the presently asserted claim 5 is nearly identical to '290 claim 11. The logic here is no different than the logic in the '290 litigation, and claim 5 requires the NSP to be the authenticator.

Third, MyMail argues that an embodiment in the specification discloses a separate party performing the authentication, rather than the NSP performing the authentication. *See* p. 18. MyMail argues that this embodiment ('318 Patent at 23:42-61) was unclaimed in the '290 Patent, but claimed in the '318 Patent. But merely stating that the unclaimed embodiment from the '290 Patent is now claimed in the '318 Patent does not make it so. MyMail cannot ignore that claim 5

---

[15] "[T]he '290 claims barred the ASP from being, and required the NSP to be, the authenticator." Repl. Br. at 3 (explaining why the embodiment at 23:52-61 is not claimed by the '290 patent).

of the '318 Patent contains effectively the same limitations as claims 11 and 13 of the '290 Patent—all of which require the NSP to perform the authentication. MyMail's cited unclaimed embodiment remains unclaimed, and so it cannot be used to alter the construction of NSP to fit a newly concocted infringement theory.

Fourth, the Federal Circuit's holding that the NSP must perform authentication is binding under the doctrine of *stare decisis*. The Supreme Court has held that *stare decisis* applies to claim construction, with the policy objective of encouraging inter-jurisdictional certainty.[16] Here, the Federal Circuit expressly affirmed the requirement that NSPs perform authentication: "we interpret the specification as requiring the NSP to perform the authentication function."[17] In so holding, the Federal Circuit cited an admission by MyMail's counsel from the *Markman* hearing, stating that "counsel acknowledged that under the patent the 'NSP has to do [authentication]'."[18]

b.   <u>"Internet service provider access service" is just another synonym for "ASP."</u>

In its Reply, MyMail reiterates its argument that the access provider could include the "internet service provider" acting as an "access service," and that this is distinct from an ASP. MyMail argues that an "internet service provider access service" is "an ISP (or NSP) acting as the access provider." *See* p. 42.  MyMail fails to reconcile this theory with its representations made during the prosecution of the '318 Patent. Instead, MyMail misleadingly quotes the amendment to avoid addressing the fatal flaw in MyMail's argument—the internet service provider access service is undeniably the same as the ASP.

MyMail states in its Reply that "the original specification referred to an 'Internet service provider access service,' but the patentee amended it to add 'or ASP (Access Service Provider).'"

---

[16] *Markman v. Westview Instruments*, 517 U.S. 370, 391, 116 S. Ct. 1384, 1396 (1996).
[17] *AOL* appeal, 476 F.3d at 1376 (construing NSP based on an analysis of the specification).
[18] *Id.* at 1377.

*See* p. 42.  MyMail's reference to the original specification, however, is deceptive. Prior to the amendment, the specification read "an Internet service provide access service **106**." Here is that amendment in context:

> In accordance with the present invention, an Internet service provider access service **or ASP (Access Service Provider)** **106** is connected to the Internet **100**.

Ex. 14, '290 Patent file history at MYMAIL 001505. The inclusion of the **106** in the quotation is important, because it references the box comprising the Internet service provider access service in Figure 1. When amended, "or ASP (Access Service Provider)" was added before the **106** reference, meaning that the **106** box was both the Internet service provider access service ***and*** the ASP. Importantly, the **106** box is separate and distinct from the Internet service provider **102** box. Looking at **106** in Figure 1 from the '318 Patent (reproduced below), it is clear that Internet service provider access service is synonymous with ASP. This equivalence is bolstered by the fact that the amendments cannot add new matter, so ASP cannot have a new meaning relative to the Internet service provider access service.



c.  <u>An "access provider" is the same as an "access service provider"—and an "access service" and an "access SP" and an "ASP"—which were all previously construed the same way.</u>

In its continued attempts to divorce the term "access provider" from prior constructions, MyMail is asking the court ignore explicit representations made to the Patent Office. Specifically, during prosecution, MyMail argued to the Patent Office that the specification disclosed an access provider. To support this, MyMail pointed to a passage in the specification regarding the "access service" (which is synonymous with ASP). Ex. 5 at MYM002820-2824, MYM002844-2845. But now that the earlier construction of ASP is inconvenient to MyMail's infringement theory, MyMail requests that the access provider "not be burdened by construction of the different ASP term". *See* p. 18.  MyMail cannot have it both ways—it obtained a patent based on representations to the Patent Office that the access provider and access service (ASP) are the same, and those representations must stick, even if they now preclude its ability to sue new defendants in good faith.

d. A "network service provider" and an "access provider" are "parties", not "businesses" and not simply "hardware and/or software."

MyMail seeks to eliminate the term "party" from the constructions of NSP and access provider. Since MyMail has utterly no support for this elimination, MyMail distorts NETGEAR's arguments and then rebuts those distortions. But, MyMail cannot ignore the intrinsic record. And the intrinsic record here demonstrates that the NSP and the access provider are parties.

First, MyMail mischaracterizes the issue as "whether a 'party' comprises hardware and/or software." *See* p. 18.  But NETGEAR does not dispute that a party could comprise hardware and/or software. Rather, NETGEAR argues that a party is more than just hardware and/or software— which it is. NETGEAR's proposed constructions for NSP and "access provider" are consistent with the way in which "party" is used in: (1) the patent; (2) MyMail's own former proposed constructions of the disputed terms; (3) the district court's constructions from the '290 litigation; and (4) the Federal Circuit's affirmation of the district court's constructions. MyMail's construction, on the other hand, is nothing more than an impermissible attempt to change the scope of the claim to fit its strained infringement theory.

Second, MyMail argues that the court should ignore the prior constructions' use of the term "party," because those constructions were decided in the context of the claims from the '290 Patent. As discussed in NETGEAR's Answering Claim Construction Brief, claim 11 of the '290 Patent and the presently asserted claim 5 are nearly identical. Notably, MyMail did not identify a single difference between claim 5 of the '318 Patent and the previously construed claim 11 of the '290 Patent that would mandate an inconsistent construction.

Third, MyMail claims that NETGEAR is requiring the NSP and access provider to be separate businesses. *See* p. 44.  This is simply untrue. NETGEAR's use of the term "party" is not synonymous with "business." As described in the '318 Patent specification, a party in the context

of the patent is responsible for servicing a given user to help provide access to a network in conjunction with one or more other parties. *See* Ex. 1, '318 Patent at abstract; 3:48-50. Notably, MyMail previously understood "party" to mean an ASP, an NSP, and a user. Ex. 13, Pl.'s '290 *Markman* Reply Claim Construction Brief, at 2. It seems that understanding dissipated sometime between filing its claim construction brief in the *AOL* litigation and deciding to sue NETGEAR.

**B.  *Term – "network access information" and "set of network access information"*[19]**

| '290 Claim Construction Order* | NETGEAR's Construction | MyMail's Construction |
| --- | --- | --- |
| information reflecting a user's identity, such as a PAP ID or PAP password, used to authenticate the user's right to communicate with the network<br><br>*This is the construction of the synonymous term "set of identification information." | information reflecting a user's identity, such as a PAP ID or PAP password, used to authenticate the user's right to communicate with the network | Plain and ordinary meaning, including in context. No construction necessary. |

1.  *MyMail's Opening Position*

These terms have a plain and ordinary meaning in context – namely, as access information for a network, and need no construction. This is consistent with the specification, which states that "access information" is information that allows the user to access the network. *Id*. at 6:30-34, 6:35-57, & 7:56-59. Although network access information could comprise "information reflecting a user's identity, such as a PAP ID or PAP password, used to authenticate the user's right to communicate with the network," it is not limited to only that information. As noted above, claims are not limited to preferred embodiments. For example, '318 claim 3 comprises obtaining a set of unused network access information and then modifying a previously provided set of log-in information with the network access information. Netgear's construction essentially means that

---

[19] The parties have agreed that "network access information" and "set of network access information" should be construed identically.

network access information is log-in information. However, as be seen, network access information is distinct from log-in information and it can be used to modify log-in information.

Netgear's construction also means that "network access information" would be limited to "ISP specific" information, which necessarily includes a PAP ID and PAP password for that ISP (or, in the lexicon of the '318 patent, that NSP). *Id.* at 2:24-27. Although embodiments noted in the specification comprise ISP specific access information (*e.g.*, *id.* & *id.* at 6:30-34), the scope of claim 5 is not limited to those embodiments.

2. *NETGEAR's Answering Position*

The term "network access information" does not appear anywhere in the specification of the '318 Patent outside of the claims. But the term "access information" does appear several times, and during patent prosecution MyMail successfully pointed to those instances for support for network access information. Ex. 5 at MYM002844-2845. Further, in the '290 claim construction, the court expressly equated access information to "set of identification information." Ex. 12 at 23 ("'Set of identification information' appears in Claim 13. Read in the context of that claim, it is synonymous with 'access information.'"). In short, the terms network access information and set of identification information mean the same thing.

NETGEAR's proposed construction for network access information is identical to the construction of set of identification information adopted in the '290 litigation. Ex. 12 at 23 (construing "set of identification information"). A key aspect of this definition, which is supported by the '318 Patent specification and by MyMail's own arguments from the '290 litigation, is that the network access information reflects the user's identity.

In the specification, the patentee repeatedly described access information as including information such as a PAP ID or PAP password, which reflect a user's identity. *See, e.g.*, Ex. 1 at 6:45-49 ("The access information mentioned comprises the previously mentioned access telephone

number, the PAP ID, the PAP password and additional ISP-specific information…"); *see also id.* at 7:54-67. In prosecuting the '318 Patent, MyMail cited several of these portions of the specification as support for network access information. Ex. 5 at MYM002844-2845. This reinforces both the prior construction and NETGEAR's current construction that the network access information reflects a user's identity.

MyMail's own arguments from the '290 litigation also support NETGEAR's proposed construction. In its claim construction briefing, MyMail argued that the synonymous term "set of identification information" should be construed as "Information reflecting a user's identity, such as a PAP ID, used to authenticate the user's right to communicate with an ASP via an NSP." Ex. 4, Pl.'s '290 *Markman* Brief at 20. MyMail's argument that the set of identification information must "reflect a user's identity" was successful, and the court included that limitation in its own construction. Ex. 12 at 23. MyMail cannot now turn around and argue for an opposite result in this litigation. *Yodlee, Inc.*, 2016 WL 204372, at *3-4 .

3. *MyMail's Reply Position*

Defendant's argument that during '290 claim construction the *AOL* court "equated" "set of identification information" with "access information" misreads that Order. Rather, that court stated that "in the context of ['290 claim 13] it is synonymous with 'access information" and it noted that access information "comprises," *i.e.*, includes but is not limited to, identification information. Ex. 12 at 23. As noted previously, access information comprises "information required by the user to gain access to the network," and may include, but is not limited to, an access telephone number, a Password Authentication Protocol (PAP) ID, a PAP password, and/or additional NSP specific information required by the user to gain access to the network. '318/6:35-51. Defendant's citations to examples where MyMail pointed to identification information serving as access information again miss the point that the narrower category of identification satisfies the broader category of

access information, which includes identification information, as well as other information for accessing a network beyond identification information. Defendant's citation to MyMail's argument in the *AOL* case that "set of identifying information" should be construed as "information reflecting a user's identity" is wholly irrelevant to the construction of the broader term "access information." Defendant's position that "identification information" and "access information" are the same contravenes the specification, plain meaning, common senses and the doctrine of claim differentiation.

### 4. *NETGEAR's Sur-Reply Position*

MyMail does not argue against the fact that network access information comprises identification information (because it cannot). Instead, MyMail argues about the definition of "comprises." But semantics cannot shield MyMail from the fact that network access information includes identification information.

MyMail cites the prior court's statement that access information (which is synonymous with network access information) "'comprises,' *i.e.*, includes but is not limited to, identification information." *See* p. 53.   MyMail then incorrectly interprets the court's statement to mean that identification information is only one possible form of network access information. *Id.*   The court's statement, however, means that network access information *does* include identification information, not that it *might* include identification information. *CIAS, Inc. v. Alliance Gaming Corp.*, 504 F.3d 1356, 1360 (Fed. Cir. 2007) ("comprises" requires all elements to be present, though other elements may also be present).

### C. *Term – "network"*

| '290 Claim Construction Order | NETGEAR's Construction | MyMail's Construction |
|---|---|---|
| a system of interconnected computers that have the ability to communicate | A network is a system of interconnected computers that have the ability to | Plain and ordinary meaning, including in context. No construction necessary. |

| | communicate. The claimed network is located between the access provider and the network service provider. | |
|---|---|---|

1. *MyMail's Opening Position*

The term "network" has a plain and ordinary meaning in context and needs no construction. MyMail does not dispute that the broad plain meaning of a network can comprise a system of interconnected computers that have the ability to communicate. *See, e.g.*, https://www.techopedia.com/definition/5537/network ("A network, in computing, is a group of two or more devices that can communicate"). The plain meaning also broadly encompasses systems with other devices that are able to communicate with each other. *See, e.g.*, https://www.merriam-webster.com/dictionary/network ("a system of computers and peripherals that are able to communicate with each other."). This generally accords with the construction of network from the *AOL* case as noted above. However, Netgear erroneously seeks to add the limitation that "the claimed network is located between the access provider and the network service provider." The specification of the '318 patent describes preferred ISP embodiments in which communications among the ISP and the devices providing access information occur over the same network, the Internet. Further, claim 5 states that a device re-access the network via the NSP; therefore, it must be on the same network as the one through which new information is downloaded, via the network, from the access provider. Further, non-asserted '318 claim 1 has the "access service" expressly connected to the network. Further, in non-asserted '318 claim 3 the access service databank is accessed via the network provided by the NSP. Further, the invention "applies to any network," such as the Internet, it "supports many types of physical connections such as telephone dial-up connections, ISDN connections, Ethernet, and other local area networking connections." '318/4:54-55 & 5:32-34. Networks of course include LANs wherein all

devices would necessarily be on the same local network. Ex. 1 at 1:50-52 & 2:35-39.

Netgear may point to an embodiment in Fig. 1 as supporting its position, but that is not a claimed embodiment as evidenced by the claim language noted above.

### 2. *NETGEAR's Answering Position*

NETGEAR's proposed construction for network has two parts. The first sentence defines the meaning of network, and comes straight from the '290 Patent claim construction. As "network" is a term of art, the court drew on contemporary dictionary definitions of the term. Those dictionary definitions of network indicate that a network has two elements: connecting and communicating.[20] The court in the '290 litigation emphasized these two elements, (Ex. 12 at 12-13 (("the definition of 'network' has two elements: connecting and communicating.")), and defined network as "a system of interconnected computers that have the ability to communicate." *Id.* at 22.

The second part of the construction addresses an issue of claim *scope* raised by MyMail's infringement claims. Specifically, the question is *where* the "network" is located with respect to the network service provider and the access provider. And the answer is the network is between the two.

First, this is seen in Figures 1 of the '318 Patent, with its simplified version on the right:

---

[20] *See, e.g.,* Ex. 12 at 12, *citing* MICROSOFT PRESS COMPUTER DICTIONARY (3d ed. 1997) ("a group of computers and associated devices that are connected through communication facilities").



FIG. 1

In Figure 1, the network (the Internet, pink) is located between the network service providers (the ISPs) and the access provider (the Access Service Provider).

This locational restriction is likewise found in the claim. Applying claim 5's language to the figures, new information is "downloaded, ***via the network***" (pink) from the access provider to the network access device (the User). This download is shown in the figures as the red line from the access service provider to the User. Because the information is "downloaded, ***via the network***," the network must be between the network access device and the access provider. This matches the location of the Internet relative to the Access Service Provider and the Users in Figure 1.

The claim goes on to state that the network access device "re-access[es] the network ***via a given network service provider*** (NSP)." This access is shown in the figures as the red line from the User to the Internet. That is, the network access device connects *to* the network by way of the network service provider, requiring the network service provider be between the network and the network access device. This matches the location of the ISPs relative to the Users in Figures 1, and the claim construction order from the '290 litigation confirms this interpretation. Ex. 12 at 22 ("and

an NSP acts similar to prior-art Network Access Providers ('NAPs'), providing the physical connection *between the customer and internet*") (emphasis added).

So if the network service provider connects the user device only *to* the network, but then the user device gets its information *over that same network* from the access provider, then that network must be in between the access provider on the one hand, and the network service provider and user device on the other. This matches Figures 1, which shows the location of the Internet relative to the Access Service Provider and the ISPs. Thus, in light of "the context of the surrounding words of the claim,"[21] the network is located between the access provider and the network service provider.

This claim scope issue should be addressed during claim construction. MyMail has raised the issue by alleging that both the network service provider and the access provider are found in the same physical box. *See* D.I. 1, Compl. for Patent Infringement, accusing NETGEAR routers. As claim construction should address not only meaning, but also disputes over scope, this issue of where the claimed network is located is ripe. *O2 Micro Int'l v. Beyond Innovation Tech.*, 521 F.3d 1351, 1362-63 (Fed. Cir. 2008).

While MyMail disputes the location of the network relative to the access provider and the NSP, its arguments are unrelated to that issue. *See* p. 55.  Rather, MyMail argues that the network need not be the internet, and that the network which is re-accessed is the same network that the network access information is initially sent over. But NETGEAR does not dispute these points, and those issues are irrelevant to *where* the network is located in relation to the other claim terms.

Finally, MyMail emphasized the "via the network" and "to the network" language at issue in the claim during prosecution, noting the specification supported issued claim 5. While MyMail

---

[21] *ACTV, Inc. v. Walt Disney Co.*, 346 F.3d 1082, 1088 (Fed. Cir. 2003).

talks much about what it did and did not argue during prosecution (*see* p. 4), ultimately claim 5

(filed claim 3) in its present form was appealed to the Board of Patent Appeals and Interferences.

At issue was whether the '318 Patent sufficiently disclosed re-accessing the same network through

which it the user's computer had downloaded the information. MyMail argued yes:

> the specification discloses at least one embodiment, for example,
> where a user's computer (1) downloads, ***via the Internet***, network
> access information for the Desired ISP, (2) modifies the computer's
> connection parameters using the network access information for the
> Desired ISP, and (3) reconnects ***to the Internet*** using the modified
> connection parameters. (emphasis in original)

Ex. 5 at MYM002863. While for a different purpose, MyMail emphasized this key locational

language that provides that the user connects first ***to the Internet*** by an NSP, but then on ***through***

***the Internet*** to the access service.

### 3.  *MyMail's Reply Position*

As already noted in MyMail's Op.Br., the '290 claims require the NSP and access provider

be on the same network, *i.e.*, "the network" as claimed. Defendant's argument that the "claimed

network is located between the access provider and the [NSP], *i.e.*, that an access provider must

use the NSP to communicate with the user, contradicts Fig. 1, which shows an ISPs (or NSPs) and

an ASPs communicating with each other and shows both communicating with users via the

Internet. It also contradicts the plain language of '318 claim 5, wherein the new information is

downloaded from an access provider to a network access device via "the network" and the access

device re-accesses the same "network" via a given NSP. In any event, Fig. 1 is only one

embodiment. Defendant's' argument the claimed "network" is only located between the access

provider and NSP is specious. Here, no such requirement exists, and Defendant has not shown any

such requirement in the '318 patent or claims.

4.  *NETGEAR's Sur-Reply Position*

MyMail states that the network is not located between the access provider and the NSP. In doing so, MyMail ignores NETGEAR's evidence to the contrary and actually cites support that contradicts MyMail's statement.

In a conclusory statement, MyMail argues NETGEAR's construction is inconsistent with the language of claim 5. MyMail offers no explanation in support of this theory. Indeed, as discussed in NETGEAR's Answering Brief, the plain language of claim 5 requires the network to be between the access provider and the NSP because: (1) new information is "downloaded, via the network" to a network access device from an access provider—so the network must be between the network access device and the access provider; (2) the network access device "re-access[es] the network via a given network service provider (NSP)"—so the NSP must be between the network and the network access device; and (3) if the network is between the access provider and the network access device, and the NSP is between the network access device and the network, then the network must be between the access provider and the NSP.

MyMail also argues that Figure 1 contradicts NETGEAR's construction of network. Specifically, MyMail asserts that Figure 1 "shows an ISPs (or NSPs) and an ASPs communicating with each other". MyMail overlooks, however, that Figure 1 shows them communicating *over the network*, with the network between them.

**D.  *Term – "re-accessing"***

| '290 Claim Construction Order | NETGEAR's Construction | MyMail's Construction |
|---|---|---|
| N/A | re-connecting to the network via a different NSP. | Plain and ordinary meaning, including in context. No construction necessary. |

1.  *MyMail's Opening Position*

This term has a plain and ordinary meaning in context and needs no construction. Netgear's

proposed construction for "re-accessing" seeks to improperly replace the term with "re-connecting," which has a different meaning, including in view of the *AOL* case construction of "disconnecting" as "to sever or interrupt a connection." The term "re-accessing" simply means "accessing again." There is no requirement that any connection be severed and then a new connection created. For example, Merriam Webster defines the term to mean "renew access," "a second access or approach," or "a return." *See e.g.*, https://www.merriam-webster.com/dictionary/reaccess(reaccess: "renew access"); https://www.merriam-webster.com/dictionary/reaccess(reaccess: "A second access or approach; a return."). In contrast, the term "re-connecting" implies that a disconnection occurs after which a re-connection must be made. *C.f. id.* with https://www.merriam-webster.com/dictionary/reconnect(reconnect: "to connect again"). The term "re-access" includes the situation where a device connected to a network enters an idle state during which no access occurs, then resumes access to the network without ever having been disconnected from the network. For example, the '318 patent uses derivations of the term "reconnect" in the specification numerous times (*see, e.g.*, Ex. 1 at Fig. 7B, 5:32/36, 8:8-12, & 16:19-23), yet it uses the word "re-accessing" in claims 3 and 5.

Netgear's attempt to add a "via a different NSP" limitation is similarly ill-advised and simply not found in the limitations for claim 5. Further, the '318 specification teaches that when a user reaccesses the network, the NSP may be the same or different NSP. *Id.* at 8:8-16. If the NSP is the same, then the user need not be "disconnected" from the network (*id.* at 8:16-20), which also refutes Netgear's ill-founded "re-connect" requirement.

### 2. *NETGEAR's Answering Position*

The term "re-accessing" is effectively defined in the specification, and NETGEAR's construction adopts that meaning. Originally, the term "re-accessing" appeared only in claim 5, and not the specification. On that basis, the Patent Examiner objected that the specification did not

support the claimed "re-accessing." Ex. at 1 8:10-11 (emphasis added). In response, MyMail inserted the words "re-access, or" into the specification: "the client dispatch application 200 may disconnect the user 110 from the current ISP 102 and _**re-access, or**_ automatically dial and reconnect the user 110 to the desired ISP 102 associated with the ISP-specific access information." Ex. 5 at MYM000244; *see also* Ex. 1 at 8:10-11 (emphasis added). MyMail argued that "no new matter has been added by this amendment," *id.*, which shows that re-accessing is the same as a "reconnecting" after a disconnect.

Furthermore, the reconnection must be to a different NSP. MyMail amended the sentence of the specification that discussed disconnecting from the current ISP (that is, NSP) and reconnecting to a desired ISP. But later in that paragraph, the specification makes clear that if the current ISP and the desired ISP are the same, the system "will not disconnect the user 110 and the user's session will continue uninterrupted." Ex. 1 at 8:16-20. Thus, a "reconnection" only occurs if the ISP's have changed.

NETGEAR's construction aligns with the purpose of the claimed invention—it is intended to simplify the process of accessing the same network through multiple NSPs, (*id.* at 4:62-5:7) where a different NSP may be desired over the current NSP "based on cost, location, availability, reliability, etc." *Id.* at 5:3-4. Re-writing the claim to allow re-accessing to occur where the initial NSP and the desired NSP are the same would negate the entire purpose of the claimed invention, in contravention of Federal Circuit policy that claim scope should be "tether[ed]" to "what the specifications indicate the inventor actually invented." *Retractable Techs., Inc. v. Becton*, 653 F.3d 1296, 1305 (Fed. Cir. 2011).

MyMail's argument in its opening brief bolsters NETGEAR's above explanation of the "different NSP" requirement. As MyMail points out in its brief, "[i]f the NSP is the same, then the

user need not be 'disconnected' from the network (*id.* at 8:16-20)." *See* p. 61.   Because the reconnecting step of re-accessing "implies that a disconnection occurs," (*id.*) and because no disconnection occurs "[i]f the NSP is the same," (*id.*) then re-accessing requires that the target NSP be different from the initial NSP.

### 3.  *MyMail's Reply Position*

Defendant notes MyMail added the word "re-access" to the specification, *see* '318/8:10, and argued no new matter was added. This is correct. As noted by the applicant, "support for this amendment can be found, among other places, in Claim 2 and Claim 3 as originally filed." Further, the term "reconnect" was already found in multiple places in the '318 specification. '318/Fig. 7B, 5:32-35, 8:11, & 16:21-23; If "re-access" had the same meaning as "reconnect," the patentee would not have used the different word, "re-access." Clearly, adding "re-access" to the phrase, "re-access, *or* automatically dial and reconnect the user 110 to the desired ISP 102" was meant to note the user could either re-access *or* reconnect, which, as noted in MyMail's Op.Br., are different concepts of different scope. Defendant seems to agree that the "reconnect" is more restrictive than "re-access," which is why it seeks to conflate these terms.

Defendant's further argument that the re-accessing must be to a "different NSP" is meritless, and appears to depend solely upon their conflation of reconnect and re-access. However, nothing in either term requires connecting to or accessing a different NSP. That was a requirement specifically written into the '290 claims using other terms (*e.g.*, initialization NSP vs. available NSP), as noted above, but it is not a requirement of the '318 claims. In fact, the first and only required involvement of the NSP in '318 claim 5 is when the network device re-accesses the network via the NSP.

Defendant's argument that "re-access" should be construed as "reconnect" based upon its other meritless arguments that separate companies are required is meritless for the same reasons

already noted.

    4.  *NETGEAR's Sur-Reply Position*

MyMail argues that re-accessing is distinct from reconnecting and must be construed accordingly. This argument contradicts MyMail's representations to the Patent Office made during the prosecution of the '318 Patent and therefore must be rejected.

As NETGEAR discussed in its Answering Claim Construction Brief, during prosecution of the '318 Patent, MyMail amended the specification to add the word "re-access", and argued that "no new matter has been added by this amendment." Ex. 5 at MYM000244 (amending the specification as follows: "the client dispatch application **200** may disconnect the user **110** from the current ISP **102** and **re-access, or** automatically dial and reconnect the user **110** to the desired ISP"). Inexplicably, MyMail now cites this amendment as support for its current argument that re-accessing *is* new matter and that it is distinct from reconnecting. *See* p. 63.  Re-accessing cannot be new, because the amendment could not add new matter. The sole purpose of this amendment was to show that re-access was supported by the specification, where it speaks of reconnecting. Contrary to MyMail's assertions, re-accessing is not some foreign concept, rather it is the same as reconnecting after a disconnection.

Furthermore, the requirement that re-accessing must be reconnecting to the network via a *different NSP* logically follows from a plain reading of the specification, which explains that there is no disconnection and reconnection if the NSP is the same. '318 Patent at 8:16-20.

## IV.   CONCLUSION

### A. *MyMail's Conclusion*

Including for the foregoing reasons, MyMail's proposed constructions of the disputed claim terms should be adopted, and Netgear's should be rejected.

**B.  *NETGEAR's Conclusion***

NETGEAR respectfully requests that the Court adopt its proposed claim constructions.


OF COUNSEL:
Kevin E. Cadwell
David R. Clonts
Ashley Edison Brown
AKIN GUMP STRAUSS HAUER & FELD LLP
1111 Louisiana Street, 44th Floor
Houston, TX 77002
(713) 220-5800

Jenna M. Pellecchia
AKIN GUMP STRAUSS HAUER & FELD LLP
Two Commerce Square
2001 Market Street, Suite 4100
Philadelphia, PA 19103
(215) 965-1230

*/s/ Daryll Hawthorne-Searight*
John W. Shaw (No. 3362)
Andrew E. Russell (No. 5382)
Daryll Hawthorne-Searight (No. 6520)
SHAW KELLER LLP
I.M. Pei Building
1105 North Market Street, 12th Floor
Wilmington, DE 19801
(302) 298-0700
jshaw@shawkeller.com
arussell@shawkeller.com
dhawthorne@shawkeller.com
*Attorneys for Defendant*


OF COUNSEL:
John J. Edmonds
Stephen F. Schlather
Shea N. Palavan
Brandon G. Moore
Eric R. Carr
COLLINS, EDMONS, SCHLATHER
 & TOWER, PLLC
1616 South Voss Road, Suite 125
Houston, TX 7057
(281) 501-3425

Dated: October 26, 2018

*/s/ Stamatios Stamoulis*
Stamatios Stamoulis (No. 4606)
STAMOULIS & WEINBLATT LLC
Two Fox Point Centre
6 Denny Road, Suite 307
Wilmington, DE 19809
(302) 999-1540
stamoulis@swdelaw.com
*Attorneys for Plaintiff*